Argued October 9, 1978, reversed and remanded
for a new trial May 8, 1979

STATE OF OREGON, *Respondent,*
*v.*
ANTONIO MIGUEL HERRERA, *Petitioner.*
(TC No. 76-278-C, CA 7539, SC 25764)
594 P2d 823

[350]

Thomas J. Crabtree, Deputy Public Defender, Salem, argued the cause for petitioner. On the brief were Gary D. Babcock, Public Defender, and Peter Robinson, Law Intern, Salem.

Catherine Allan, Assistant Attorney General, argued the cause for respondent. On the brief were James A. Redden, Attorney General, Al J. Laue, Solicitor General, and John W. Burgess, Assistant Attorney General.

LENT, J.

**LENT, J.**

Defendant was convicted by a jury of murder. ORS 163.115. His conviction was affirmed by the Court of Appeals, *State v. Herrera,* 32 Or App 397, 574 P2d 1130 (1978). We allowed review to consider (1) whether the defendant's right to confront witnesses against him was violated when the state introduced into evidence the testimony of a key witness given upon preliminary hearing; and (2) whether the defendant's requested instructions concerning his affirmative defense of mental disease or defect excluding responsibility based on drug dependence should have been given. We reverse and remand for a new trial.

On July 19, 1976, Samuel Newman was found stabbed to death. Several days later defendant was arrested in connection with the stabbing. At that time defendant told the police that Newman had been hitchhiking when defendant and the Lerma brothers, Steve and Phil, picked him up. Defendant said that he was driving the car, that Phil Lerma was in the back seat, that Newman and Phil got into an argument, and that Phil stabbed Newman to death while defendant tried to stop him.

Phil Lerma told the police essentially the same story as defendant. Steve Lerma, however, told the police that he had been driving, that defendant had initiated the stabbing, and that Phil had participated in the stabbing.

On August 1, 1976, Steve Lerma and the district attorney entered into a "Conditional Immunity Agreement." The agreement specified, among other things, that if Steve Lerma gave a full statement to the police, "passed" a polygraph test, and agreed to testify for the state at all hearings, he would not be prosecuted.[1] A

---

[1] The immunity agreement stated in full:

*"CONDITIONAL IMMUNITY AGREEMENT*

"We, the undersigned, do hereby agree that STEVE LERMA shall be granted immunity for any criminal act in which he may have

few days later he gave the police a statement and "passed" the polygraph test.

On September 1 and 2 Steve Lerma testified for the state at the defendant's preliminary hearing. On November 24, 1976, the last business day before defendant's trial, Steve Lerma was charged by information with felony murder. Until that time there had never been any indication by the district attorney that he did not plan to honor the August immunity agreement.

---

participated in on or about the 19th day of July, 1976, connected to the death of SAMUEL KENNETH NEWMAN. This agreement of conditional immunity is, however, based upon the following conditions which must be complied with before the grant becomes effective."

"1. Steve Lerma will make a full statement to the Klamath Falls City Police and provide any information which he has regarding the circumstances of the death of Samuel Kenneth Newman.

"2. Steve Lerma will testify as directed by the District Attorney at all legal proceedings which may directly or indirectly result from the death of Samuel Kenneth Newman.

"3. Steve Lerma will take a polygraph examination to verify the truthfulness of the statements given to the police regarding the death of Samuel Kenneth Newman.

"4. The grant of immunity is based on the understanding that both Mr. Lerma's statement and the result of the polygraph tests demonstrate

"(a) That he, Steve Lerma, took no part whatsoever in the acts of stabbing Samuel Kenneth Newman which caused Samuel Kenneth Newman's death, and further,

"(b) That Steve Lerma did not participate in or plan the commission of robbery or any other felony, the execution of which directly or indirectly resulted in the death of Samuel Kenneth Newman, and which would give rise to the operation of the felony-murder doctrine. Mere physical presence by Steve Lerma at the crime scene at the time of death, however, shall not constitute a violation of this agreement.

"In the event that all of the above conditions are complied with, it is understood by the parties hereto that there shall be no criminal proceedings against Steve Lerma for any other action he may have taken on July 19, 1976, which was related to the death of Samuel Kenneth Newman. If, however, all the conditions are not complied with, it is understood that this agreement shall be null and void and of absolutely no effect, and the prosecution unaffected hereby. If Steve Lerma does not pass the state administered polygraph test, he shall have the right to an independent test.

"Dated this 2 day of August, 1976, at Klamath Falls, Oregon."

[352]

At defendant's trial Steve Lerma refused to testify on the ground that his testimony might incriminate him. Over defendant's objection, the prosecutor read a transcript of Steve Lerma's preliminary hearing testimony to the jury.

After the defendant was convicted, Steve Lerma was allowed to plead guilty to a charge of hindering prosecution, a class C felony, and on February 11, 1977, was placed on three years probation.

I. Admission of prior testimony

Defendant's first assignment of error concerns the admissibility at trial of Steve Lerma's testimony from the preliminary hearing. The trial court allowed the state to introduce the testimony over defendant's objection that its admission denied him his right to confront witnesses face to face.[2]

The right of confrontation protects two vital interests of the defendant. First, it guarantees that the defendant has an opportunity to cross-examine the witness against him in order to test his sincerity, memory, ability to perceive and relate, and the factual basis of his statements. This purpose of confrontation helps to assure the accuracy of the result of the truth-determining process by giving the accused an opportunity to test the recollection and sift the conscience of a witness. *Barber v. Page,* 390 US 719, 88 S Ct 1318, 20 L Ed2d 255 (1968). We do not understand defendant to contend that either his opportunity to cross-examine or his cross-examination was insufficient to protect this first interest.

---

[2] Oregon Constitution, Art I, § 11:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury * * * to meet the witnesses face to face * * *."

U S Constitution, Amend VI:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * * and to be confronted with the witnesses against him; * * *."

The federal right of confrontation applies in state trials as part of due process under the Fourteenth Amendment. *Pointer v. Texas,* 380 US 400, 85 S Ct 1065, 13 L Ed2d 923 (1965).

The second interest of the defendant which the right to confrontation protects is enabling the defendant to demonstrate to the jury the witness' demeanor when confronted by the defendant so that the credibility of the witness is displayed in the courtroom. This second purpose is no less important than the first. As this court recently said in *State v. Smyth,* 286 Or 293, 593 P2d 1166, (1979):

> "In our system a defendant is not tried on a dossier compiled in prior hearings, no matter how fairly and judiciously conducted. His guilt must be established at the trial by evidence that convinces a factfinder beyond a reasonable doubt. But the earlier opportunity to question the witness will often avail little when the jury at the trial sees neither the witness nor the effect of the cross-examination recorded in a cold transcript. As the United States Supreme Court stated in *Barber,* '[t]he right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness.' 390 US at 725, * * *."

This case, as well as any, demonstrates the importance to the defendant of cross-examining a witness in the presence of the jury so that it may judge the witness' credibility. Here there seems to be no dispute that three persons—defendant, Phil Lerma, and witness Steve Lerma—picked up the victim. The actions of these three people, therefore, are the key to defendant's guilt or innocence. Since the testimony of one of these three people, Steve Lerma, constitutes in significant measure the state's case against defendant and since his story differs significantly from that of the defendant and Phil Lerma, the defendant's case at trial will center on Steve Lerma's credibility. If the jury does not believe Steve Lerma's story beyond a reasonable doubt, defendant might well be acquitted.

■   The confrontation clause, while guaranteeing the defendant the right to confront a witness face to face, is not without exception. One such exception under which prior recorded testimony which was subject to

cross-examination may be introduced into evidence at trial exists when a witness is truly unavailable to testify at a trial. *Barber v. Page, supra.* However, because of the defendant's strong interest in confronting his accusers and the prosecutor's duty to provide a fair trial for the defendant and protect the defendant's constitutional rights,[3] the prosecutor's invocation of this exception cannot be granted routinely.

Before a prosecutor can use prior recorded testimony and thus deprive a defendant of his right at trial to confront his accusers face to face, he must first show the trial court that use of the former testimony is a genuine necessity. *State v. Smyth, supra.* The burden is on the prosecutor to produce evidence to show the trial court what circumstances exist which make use of the prior recorded testimony genuinely necessary.

Here the state has not made such a showing. The state argues that Steve Lerma's assertion of the privilege against self-incrimination at trial is a claim of a personal privilege over which it had no control. While it is true that a claim of a privilege is personal to the witness and in many circumstances may constitute sufficient unavailability to justify use of former testimony,[4] the relationship between the state and Steve Lerma in this case requires further inquiry into the circumstances of his assertion of the privilege.

Before the preliminary hearing the district attorney and Steve Lerma executed the conditional immunity agreement. The record indicates that before the preliminary hearing Steve Lerma met the conditions of the agreement by giving a statement to the police

---

[3] *See State v. Osborne,* 54 Or 289, 103 P 62 (1909) and *State v. Jones,* 279 Or 55, 566 P2d 867 (1977).

In *Jones* this court stated at 279 Or at 63:

"* * *While it is expected that a prosecuting attorney will be zealous in his efforts to convict a defendant believed by him to be guilty of a crime, it must also be remembered that the prosecuting attorney, as a representative of the state, owes a primary duty to see that all criminal defendants receive a fair trial."

[4] *State v. Rawls,* 252 Or 556, 451 P2d 127 (1969).

and "passing" a polygraph exam. He then testified at the preliminary hearing based on the assumption that the immunity agreement was in effect. The state obtained Steve Lerma's preliminary hearing testimony with a promise of immunity. In order to use that testimony on the basis of unavailability of the witness at trial, at the minimum the state must show good cause for breaking its promise or why it does not wish to avail itself of statutes which can compel his testimony at the trial.

■ The prosecutor has discretion in charging persons for crimes. He can, therefore, execute immunity agreements such as the one in this case. He also has the power, by statute,[5] to ask the trial court to compel a witness to testify and thereby be granted immunity from prosecution. Either of these powers will eliminate a witness' privilege not to testify. If the state uses the existence of its power to obtain for itself favorable preliminary hearing testimony, it must explain why it does not wish to further use its power to produce

---

[5] ORS 136.617 provides:

"In any criminal proceeding before a court of record or in any proceeding before a grand jury, or in any proceeding before a court of record under ORS 646.760, if a witness refuses to testify or produce evidence of any kind on the ground that he may be incriminated thereby, and if the prosecuting attorney moves the court to order the witness to testify or produce evidence, the court shall forthwith hold a summary hearing at which the witness may show cause why he should not be compelled to testify or produce evidence, and the court shall order the witness to testify or produce evidence regarding the subject matter under inquiry unless the court finds that to do so would be clearly contrary to the public interest. The court shall hold the summary hearing outside the presence of the jury and the public and may require the prosecuting attorney to disclose the purpose for which he seeks the testimony or evidence. The witness shall be entitled to be represented by counsel at the summary hearing."

ORS 136.619 provides:

"After complying with the order to testify or produce evidence the witness shall not be prosecuted or subjected to any penalty or forfeiture for or on account of any fact or act concerning which, in accordance with the order, he was required to testify or produce evidence. The witness may nevertheless be prosecuted for any perjury or false swearing committed in accordance with the order and the witness shall be subject to penalty for contempt of court for failure to comply with the order."

testimony at trial in order to satisfy the defendant's right to confrontation. Without requiring such an explanation from the prosecutor, he is in a position of preserving and using favorable preliminary hearing testimony from a potentially uncredible witness by charging or threatening to charge the witness with a crime before trial.[6]

---

[6] The United States Supreme Court cases dealing with the federal confrontation clause have also focused on the conduct of the parties in deciding whether the defendant has been denied confrontation rights. *See, e.g., Motes v. United States,* 178 US 458, 20 S Ct 993, 44 L Ed 1150 (1900) (absence of witness no excuse where government permitted him to escape); *Mattox v. United States,* 156 US 237, 15 S Ct 337, 39 L Ed 409 (1895) (dictum); *Reynolds v. United States,* 98 US 145, 25 L Ed 244 (1878) (no denial of confrontation; absence of "wife" apparently procured by defendant). *Barber v. Page,* 390 US 719, 88 S Ct 1318, 20 L Ed 2d 255 (1968) (prosecutor must make good faith effort to bring imprisoned out-of-state witness to testify). And see *California v. Green,* 399 US 149, 90 S Ct 1930, 26 L Ed 2d 489 (1970) in which the court said at 166:

"* * * If [the declarant] had died or was otherwise unavailable, the Confrontation Clause would not have been violated by admitting his testimony given at the preliminary hearing—the right of cross-examination then afforded provides substantial compliance with the purposes behind the confrontation requirement, *as long as the declarant's inability to give live testimony is in no way the fault of the State."* (emphasis added)

*See, also,* Graham, Kenneth W., "The Right to Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One." 8 Crim Law Bull 99 (1972) in which Prof. Graham states at 139:

"Another factor which the court has considered relevant is the responsibility of the parties for the existence of the claimed excuse. A defendant who murders a witness ought not be permitted to invoke the right of confrontation to prohibit the use of his accusation. Nor on the other hand should the prosecutor be allowed to encourage a witness to invoke privilege by threats of criminal charges. As I have previously indicated, this factor ought not to mean that simple absence of fault on the part of the state justifies the use of unconfronted testimony, because the purpose of the Sixth Amendment was to place the risks of proof upon the state." (footnote omitted)

He adds at 139, n. 192:

"Where the witness claims privilege, it might well be argued that the prosecution under some circumstances is obliged to grant immunity in order to satisfy the confrontation clause. For example, where the prosecution has procured the testimony by a promise of immunity and conviction of the witness has been forgone in any event, it seems indefensible not to require the immunity to be formalized before rather than after the testimony. The defendant needs to cross-examine for the same reason the prosecution may feel it wants to hold the club of conviction over the witness—distrust of his credibility."

In this case not only did the state fail to explain the circumstances surrounding its agreement with Steve Lerma, it asserted and the trial court apparently agreed that the defendant had the burden of showing the prosecutor's bad faith toward the defendant. This, of course, is an incorrect statement of the applicable standard just set forth. The prosecutor is the party who wishes to use the prior recorded testimony which will deny the defendant his constitutional right to confront witnesses. He must, therefore, justify the use of the evidence and show he was in no way responsible for the necessity of its use.

An explanation of the circumstances surrounding the immunity agreement, preliminary hearing testimony, witness' information, and trial might well have shown that the state had done everything possible to enable the defendant to confront Steve Lerma. However, without any explanation of its actions we must hold that the state did not meet its burden of showing that the testimony of its witness was unavailable.

II. Mental disease or defect instructions

At the conclusion of the trial, the defendant requested two instructions[7] based on his affirmative

Finally, *see* Note, *Confrontation and the Hearsay Rule,* 75 Yale L J 1434 (1966) suggesting that the confrontation clause be construed as a "standard of prosecutorial behavior."

[7] Defendant's requested instructions are as follows:

"The defense of mental disease or defect excluding responsibility has been raised.

"A person is not criminally responsible for his conduct if, at the time of the conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

"The defense of mental disease or defect excluding responsibility is an affirmative defense which must be proved by the defendant. The defense must be proved by a preponderance of the evidence, that is, by that amount of evidence which, when weighed with that opposed to it, has more convincing force and the greater probability of truth.

"If you find that the defendant is 'not guilty by reason of mental disease or defect excluding responsibility' you will have an appropriate form of verdict."

defense of mental disease or defect excluding responsibility. ORS 161.295. These instructions were based on evidence presented at trial concerning defendant's drug dependence which had begun at age 11 and had continued during the six years before trial.

Since this conviction must be reversed, we need not decide whether the evidence presented in this case raised a mental disease or defect defense sufficiently to require its submission to the jury. However, in light of the nature of the evidence introduced, the requested instructions, and the probability that defendant will raise the defense at retrial, we think that a clarification of the relationship between drug dependence and the affirmative defense of mental disease or defect is necessary.

The affirmative defense of mental disease or defect excluding responsibility is set forth in ORS 161.295 which states:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of

---

"The issue of intoxication has been raised.

"If you find that the defendant has a history of excessive and long-continued use of drugs, or intoxicants [which] produces a mental condition, either permanent or intermittent, which condition exists when the unlawful act stated in the indictment is committed, and such mental condition is of the nature that the defendant lacked the substantial capacity because of said condition to either appreciate the criminality of his conduct or to conform his conduct to the requirements of law, then, in that event, if you find such, you shall return a verdict that the defendant is not guilty by reason of mental disease or defect, excluding responsibility. You are further instructed that the above defense of intoxication to that degree must be proved by the defendant by a preponderance of the evidence, that is, by that amount of evidence which, when weighed with that opposed to it, has more convincing force and the greater probability of truth."

Defendant's second requested instruction uses the words "mental condition" instead of the statutory terms "mental disease or defect." The trial judge could, therefore, have refused to give the defendant's second requested instruction under the rule that a "requested instruction is always properly refused unless it ought to have been given in the very terms in which it was proposed." *State v. Quartier,* 118 Or 637, 247 P 783 (1926). Cited with approval in *Carter v. Mote,* 285 Or 275, 290, n. 4, 590 P2d 1214 (1979).

mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

"(2) As used in chapter 743, Oregon Laws 1971, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

Under this statute the decision of whether the defendant has a mental disease or defect is a question of fact for the jury. In order to send the issue to the jury for its consideration, however, there must be enough evidence presented, as a matter of law, to permit reasonable persons to conclude that the evidence preponderates in favor of a finding of mental disease or defect. *See* A. Goldstein, *The Insanity Defense* 111 (1967). The defendant in this case argues that, as a matter of law, evidence of drug dependence alone is sufficient evidence of a mental disease or defect to entitle him to a mental disease or defect instruction.

In order to decide if drug dependence alone can be equated with the terms mental disease or defect, it is necessary to first look at the statutes to see if the legislature has given any guidance. ORS 161.295 itself only excludes the conduct in subsection (2) from consideration as a mental disease or defect. It, therefore, contains no specific prohibition against equating drug dependence with mental disease or defect.

Chief Judge Schwab in his concurring opinion in the Court of Appeals argued that the legislature had answered defendant's argument to the contrary when it amended ORS 161.125(1) to add "Drug use, dependence on drugs" to voluntary intoxication.

ORS 161.125(1) states:

"(1) Drug use, dependence on drugs or voluntary intoxication shall not, as such, constitute a defense to a criminal charge, but in any prosecution for an offense, evidence that the defendant used drugs, or was dependent on drugs, or was intoxicated may be

offered by the defendant whenever it is relevant to negative an element of the crime charged."

Judge Schwab concluded that by preventing drug dependence from being used as a defense in ORS 161.125, the legislature had also intended to preclude drug dependence from being the basis of the mental disease or defect affirmative defense in ORS 161.295.

This analysis, however, disregards the distinction between a "defense" and an "affirmative defense."

ORS 161.055 says:

"(1) When a 'defense,' other than an 'affirmative defense' as defined in subsection (2) of this section, is raised at a trial, the state has the burden of disproving the defense beyond a reasonable doubt.

"(2) When a defense, declared to be an 'affirmative defense' by chapter 743, Oregon Laws 1971, is raised at a trial, the defendant has the burden of proving the defense by a preponderance of the evidence.

"(3) The state is not required to negate a defense as defined in subsection (1) of this section unless it is raised by the defendant. 'Raised by the defendant' means either notice in writing to the state before commencement of trial or affirmative evidence by a defense witness in the defendant's case in chief."

Because a defense and an affirmative defense have been defined differently by the legislature, the fact that drug dependence has been excluded as a defense which must be disproved by the state does not clarify its relationship to the affirmative defense of mental disease or defect which the defendant must prove.

The legislature has, however, given a somewhat clearer indication of how drug dependence relates to mental disease in ORS 430.405 and 430.415.

In ORS 430.415 the legislature has defined drug dependence as an "illness." The dual nature of that illness is explained by the definition of a drug dependent person in ORS 430.405(1):

" 'Drug-dependent person' means one who has lost the ability to control the use of dangerous drugs or

other drugs with abuse potential, or who uses such drugs to the extent that his health or that of others is substantially impaired or endangered or his social or economic function is substantially disrupted. A drug-dependent person may be physically dependent, a condition in which the body requires a continuing supply of a drug to avoid characteristic withdrawal symptoms, or psychologically dependent, a condition characterized by an overwhelming mental desire for continued use of a drug."

Because drug dependence can have either physical or mental aspects, we conclude that evidence of drug dependence alone will not be enough evidence of a "mental disease or defect" to justify the giving of a defendant's mental disease or defect instruction.

In order to be entitled to such an instruction, further evidence which indicates that the drug dependence has resulted in a mental disease or defect—evidence beyond the mere fact of dependence itself—will have to be presented.

In *State v. Smith,* 260 Or 349, 490 P2d 1262 (1971) this court stated the same conclusion about alcoholism and its relationship to the then insanity defense:

"* * * We have frequently stated, 'if excessive and long-continued use of intoxicants *produces* a mental condition of insanity, permanent or intermittent, which insane condition exists when an unlawful act is committed, such insane mental condition may be of a nature that would relieve the person so affected from the consequences of the act that would otherwise be criminal and punishable.' [Citations omitted] These cases treat insanity *caused* by intoxication the same as insanity brought about by any other cause. * * *" (emphasis added) (citations omitted) 260 Or at 352-53.

Our opinion in *Smith* is predicated on the understanding that evidence has been presented showing that the alcoholism has resulted in "insanity." We continue that understanding in this case by requiring that before a defendant may rely on this defense evidence must be introduced that defendant's drug

dependence has resulted in his asserted mental disease or defect.

Reversed and remanded for a new trial.