Argued and submitted April 8, affirmed and remanded for resentencing June 29, 1983

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## CURTIS L. FARBER,
*Petitioner on Review.*

(TC 80-9-30, CA 19380, SC 29091)

666 P2d 821

J. Michael Alexander, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief was Brown, Burt, Swanson & Lathen, Salem.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent on review. Dave Frohnmayer, Attorney General, William F. Gary, Solicitor General, and Rudolph S. Weterband, Assistant Attorney General, Salem, filed the brief for respondent on review.

John S. Ransom, Portland, filed an Amicus Curiae brief for ACLU Foundation of Oregon, Inc. With him on the brief was Ransom, Blackman & Simpson, Portland.

CAMPBELL, J.

## CAMPBELL, J.

Defendant appeals his jury conviction for murder. He contends that the trial court erred in admitting statements made by his alleged coconspirator. The claim of error involves questions of the nature of the hearsay testimony, the sufficiency of the evidence establishing the alleged conspiracy and defendant's federal constitutional right of confrontation. The Court of Appeals initially reversed defendant's conviction, but on reconsideration, affirmed the conviction and remanded for resentencing.[1] *State v. Farber,* 59 Or App 725, 652 P2d 372 (1982). We also affirm his conviction.

The state's basic theory of the case is that defendant Curtis Farber owed money to his drug supplier, Harry Foss, Jr. Because someone stole defendant's supply of drugs, he was unable to pay his debt to Foss, so he hired Whitney to kill Foss.

At trial defendant admitted that early in May of 1980 he decided to make some money by selling cocaine. He bought 11 ounces of cocaine from the murder victim, Foss. He agreed to pay $1,950 per ounce for a total price of $21,450. Foss "fronted" these drugs to Farber, which meant that Farber could wait to pay Foss for the drugs until after the drugs were all sold. Defendant planned to sell the cocaine in smaller quantities for profit. He disposed of four ounces of the cocaine. On June 17, 1980, someone stole the remaining seven ounces of cocaine from his car.

Although Farber did not know it, three of his tenants were responsible for the theft. Mark Whitney lived in a house owned by Farber. A young woman named Kerry Fouts and a young man named Kevin Freer lived with him in the house. Farber evidently told Whitney that he expected to get some cocaine from his supplier soon. Whitney was going to help Farber sell some of the cocaine for a share of the profit. Whitney guessed that Farber had the drugs in his car on June 17, 1980, and arranged with Fouts and Freer that the three of them would steal the cocaine, which they did. After the theft, they sold some of the cocaine and consumed the rest.

---

[1] Defendant was sentenced to life imprisonment with a 25-year minimum. He must be resentenced consistent with *State v. Shumway,* 291 Or 153, 630 P2d 796 (1981).

Following this theft, Farber came to his tenant and friend Whitney and told him the drugs had been stolen. Farber speculated with Whitney about who might have been responsible for it. Whitney, of course, did not admit that he or his friends were the actual thieves. He suggested to Farber that the supplier might be responsible for the theft. Farber was concerned with the $22,000 debt he owed to the supplier Foss, and the fact that most of the drugs had been stolen. There was testimony that in the past Foss told people that he had "Mafia" connections and could have people "strong-armed" if they did not pay their drug debts. Whitney evidently encouraged Farber to believe that Foss had to be "taken care of." Fouts testified that she heard Farber say he either had to pay Foss or have him killed. She also said she heard a discussion about how much Whitney would receive for killing Foss.

A few days after the theft, Kerry Fouts told a friend that she, Freer and Whitney stole the cocaine. When Whitney heard about this, he threatened Fouts with violence and she moved out of the shared house. Within a few days, Whitney and Freer also moved out. They lived in several different places during the next days. They remained in contact with Farber, who was still concerned about the debt he owed Foss. According to testimony, Farber decided to hire Whitney to "stop" Foss. This was understood to mean either scare him off so he would not demand money from Farber or kill him if this was necessary.

Neither Whitney nor Freer had ever seen Foss or heard his name. Farber only referred to him as "the man" or the supplier. Farber described Foss and the car he drove and gave Whitney his home address. They discussed a possible stake-out.

On June 25, 1980, Whitney and Freer moved to a mobile home owned by Farber. The two halves of the mobile home had not been fastened together yet and Farber was concerned about security. Farber was at the site off and on.

On the morning of June 27, 1980, Whitney and Freer were at the mobile home. Shortly after Farber left, a man arrived at the trailer site. Both the man and the car he was driving matched the descriptions that Farber had given them. The man, Foss, got out of his car and asked where Farber was.

Whitney shot him several times when he was returning to his car. Freer also shot in Foss' direction.

After this shooting, Whitney and Freer put Foss' body in the trunk of their car. They drove around looking for a place to dispose of Foss' body. On June 29, 1980, they finally got rid of the body in an incinerator at a local dairy. Whitney called Farber and arranged a meeting at a restaurant that same day. Immediately after the meeting with Farber, Freer saw that Whitney had some cash, which he estimated at between $500 and $1,000, which Whitney did not have before the meeting.

Freer pleaded guilty to conspiracy to commit murder and testified at Farber's trial. Whitney pleaded not guilty to a charge of murder. Defendant's counsel told this trial court that Whitney's counsel said Whitney would claim his privilege against self-incrimination and would not testify at Farber's trial.[2]

Farber was charged with murder in violation of ORS 163.115(1).[3] At his trial, he stipulated that Foss was shot and killed by Whitney at the place and time and in the manner that the state claimed. Farber further admitted that he told Whitney about his problems with the stolen cocaine and the debt he owed his supplier, but he denied hiring Whitney to kill

---

[2] Whitney was later acquitted following a jury trial.

[3] At the time of the trial, this statute read:

"(1) Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder when:

"(a) It is committed intentionally by a person who is not under the influence of an extreme emotional disturbance; * * *"

The state contends Farber is liable for Foss' death as an aider and abettor under ORS 161.155(2):

"A person is criminally liable for the conduct of another person constituting a crime, if:

"(2) With the intent to promote or facilitate the commission of the crime he:

"(a) Solicits or commands such other person to commit the crime; or

"(b) Aids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime; * * *"

Foss. He testified he was on a bicycle ride all day on June 29, and thus could not have met Whitney and paid him off.

Because of the testimony by Freer and Fouts, the state contended that it had established that a conspiracy existed and moved the court to allow the admission of hearsay statements made by Whitney under the coconspirator exception to the hearsay rule.[4] Over defendant's objections, the court ruled that the state had established a prima facie case of conspiracy and allowed further testimony by both Freer and Fouts concerning statements that Whitney had made. Defendant's brief characterizes this challenged testimony as follows:

> "Freer was first recalled and testified that after Whitney and the Defendant had a conversation, Whitney said that he would have his debt cancelled with Farber and receive some additional money if he 'took care of the situation' with Foss. After another meeting between Farber and Whitney, Whitney told Freer that the Defendant's supplier was coming back to town. Whitney and Freer then discussed how they would 'stake out' Foss' neighborhood, and either scare him away or shoot him. After the actual shooting, when Whitney talked briefly with Defendant, Freer testified that Whitney said he had told Farber that 'his man was taken care of', and that Defendant had said they would meet in town later that week. Whitney later told him that he got money from Farber during the meeting at Carrows." (Footnote omitted.) (Testimony of Mr. Freer, Tr at 919-924, 930-932.

> "Kerry Fouts then supplemented her prior testimony by saying that Whitney told her that Farber was going to pay him $14,000 to have 'his man' (his drug supplier) killed. Whitney later told her that he had a 'contract' from Farber and that he

---

[4] At the time of trial, ORS 41.900(6) provided as follows:

"Evidence may be given of the following facts:

"(6) After proof of a conspiracy, the declaration or act of a conspirator against his coconspirator, and relating to the conspiracy."

The parallel provision of the Oregon Evidence Code 801(4)(b)(E) effective January, 1982 provides as follows:

"(4) Statements which are not hearsay. A statement is not hearsay if:

"(b) Admission by a party-opponent. The statement is offered against a party and is:

"(E) A statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

was going to stake out Foss." (Testimony of Ms. Fouts, Tr at 989-991.)[5]

Defendant's claim of error is based solely on the admission of this evidence. He contends that the trial court should have excluded this evidence on three different bases: (1) the nature of the hearsay testimony; (2) there had been insufficient evidence to establish a conspiracy; and (3) the admission of this evidence was a violation of defendant's constitutional right of confrontation.

## THE NATURE OF THE HEARSAY TESTIMONY

The early history of the admission of a coconspirator's statement in view of the rule against the admission of hearsay is unclear, although this exception to the hearsay rule was cited as early as 1794 in the English trial of Thomas Hardy. *Trial of Thomas Hardy,* 24 How St Tr 200, 451-453, 473-477 (1794). The first mention in a United States Supreme Court case was *United States v. Gooding,* 25 US (12 Wheat) 460, 467-468, 6 LEd 693 (1827). The exception has been codified in Oregon law since 1862. Act of October 11, 1862, § 696(6).

This exception has been justified on three different grounds: 1) these statements were made by the defendant's agent, and thus should be considered statements of the principal;[6] 2) these statements tend to be inculpatory, and thus are likely to be trustworthy for the same reasons that statements against interest are;[7] and 3) these declarations must be admitted out of necessity because this is an area of law where proof

---

[5] The brief also refers to testimony that Fouts gave on cross-examination. Surely defendant does not contend it was error to admit this testimony. We note that defendant claimed error in the admission of "hearsay statements of Mark Whitney" and did not further specify exactly what testimony is in question beyond these quoted summaries and transcript references. We note that the Rule of Appellate Procedure 7.19(2) requires specificity in the assignment of error. We therefore restrict our review to testimony appearing on the above-mentioned pages of the transcript. We note that some testimony reproduced in the second Court of Appeals opinion, *State v. Farber,* 59 Or App 725, 729-730, actually came from TR 927-928 and apparently was not relied upon by defendant in his assignment of error.

[6] This is the theory by which the earlier cases explained the coconspirator's exception. *See State v. Keller,* 143 Or 589, 599, 21 P2d 807 (1933). The explanation has been criticized. Note, *Developments in the Law of Conspiracy,* 72 Harv L Rev 920, 989 (1959).

[7] Levie, *Hearsay and Conspiracy,* 52 Mich L Rev 1159, 1161 (1954).

is difficult.[8] Under both the past and present statute, the reason for the theory supporting the admission of these statements is immaterial.

■     Defendant's first objection is evidently that ORS 41.900(6) only makes statements admissible as coconspirator's statements if they are "statements having a more significant bases [sic] for reliability." He summarizes some cases that he contends support his proposition that even under this statute only incriminating statements or statements directly relating to the declarant's own actions or observations are admissible. We do not read either the statute nor the cases so narrowly. The above testimony is the sort made admissible under former ORS 41.900(6).

## SUFFICIENCY OF THE EVIDENCE TO ESTABLISH A CONSPIRACY

■     Defendant also contends that the state failed to introduce sufficient evidence to prove a conspiracy in order to provide the proper foundation for the introduction of the coconspirator's statements. We agree with both the trial court and the Court of Appeals that although much of the evidence supporting the state's theory of a conspiracy was circumstantial, it is sufficient to establish a prima facie case of conspiracy[9] and thus provide the necessary foundation for the admission of this evidence. Defendant admitted that he told Whitney that his cocaine had been stolen and he was in trouble with his supplier. He denied hiring Whitney to kill Foss, but Fouts testified that she heard defendant discuss with Whitney that they were either going to have to pay the supplier back or have him killed, and also heard Farber talk about Whitney getting paid for the killing. Defendant stipulated that Whitney killed Foss. Freer testified that after he and Whitney met with Farber to report that they had disposed of Foss' body, Whitney showed him cash totalling between $500 and $1,000 that Whitney did not have when the two men entered the restaurant. This evidence was introduced before the trial court admitted the challenged testimony. From this evidence, a juror might well find that Farber conspired with

---

[8] *Id.* at 1166.

[9] Indeed, the evidence to establish a conspiracy is generally circumstantial. *State v. Ryan,* 47 Or 338, 344, 82 P 703 (1905).

Whitney to kill Foss, and paid him for the deed. Therefore, Whitney's out-of-court statements were admissible under ORS 41.900(6).

## CONFRONTATION CLAUSE

■ Defendant's final argument is that the admission of Whitney's statements violated his confrontation right under the federal constitution.[10]

The confrontation clause guarantees that a defendant has the right to "confront" the witnesses against him. If "confront" means an actual face-to-face encounter with a right of cross-examination, no hearsay could be allowed in a criminal trial, because hearsay is by definition an out-of-court statement offered in court for the truth of the matter asserted. The main and essential purpose of confrontation is to secure the opportunity of cross-examination in order to test the perception, memory and credibility of the witness. *Davis v. Alaska,* 415 US 308, 315-316, 39 LEd 2d 347, 94 S Ct 1105 (1974). It is clear, however, that some hearsay statements are admissible, even in light of the confrontation clause.

In 1924 the United States Supreme Court without extensive discussion held that the confrontation clause does not prohibit introduction of declaration of a coconspirator who is unavailable at the time of trial. *Delaney v. United States,* 263 US 586, 590, 44 S Ct 206, 68 LEd 462 (1924). In *Pointer v. Texas,* 380 US 400, 403, 85 S Ct 1065, 13 LEd 2d 923 (1965) the court held for the first time that the confrontation clause is applicable to the states through the fourteenth amendment and found the hearsay evidence in question to be inadmissible because of the confrontation clause. Through a series of cases following *Pointer,* the court found further

---

[10] United States Constituion, Sixth Amendment: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." A majority of this court has recently stated that we should first consider constitutional questions under the applicable provisions of the Oregon Constitution. *State v. Caraher,* 293 Or 741, 653 P2d 942 (1982). Here, although the text of the Oregon Constitution differs - "In all criminal prosecutions, the accused shall have the right * * * to meet the witnesses face-to-face * * *" - Oregon Constitution, Article I, section 11 - and although a majority of the court would prefer to decide this case under the Oregon Constitution, the parties have not briefed the question under the Oregon Constitution or pointed out any reason why the result would be different under the Oregon Constitution. *See State v. Herrera,* 286 Or 349, 594 P2d 823 (1979). We therefore decline the invitation to decide this case under the Oregon Constitution.

violations of the confrontation clause by the admission of hearsay. *See, Douglas v. Alabama* (purported accomplice's confession), 380 US 415, 85 S Ct 1074, 13 LEd 2d 934 (1965); *Barber v. Page* (preliminary hearing transcript), 390 US 719, 88 S Ct 1318, 20 LEd 2d 255 (1968); *Bruton v. United States* (confession in a joint trial), 391 US 123, 88 S Ct 1620, 20 LEd 2d 476 (1968).

The issue of the admissibility of a coconspirator's testimony in view of the confrontation clause was directly presented in *Dutton v. Evans,* 400 US 74, 91 S Ct 210, 27 LEd 2d 213 (1970), but unfortunately was not resolved. Justice Stewart, writing for the four person plurality, suggested that this clause does not require cross-examination of declarant where the policies underlying the clause are sufficiently protected, and found them to be so protected in that instance. Justice Harlan, concurring only in the result and writing only for himself, said that hearsay should be judged under a flexible due process requirement of the essentials of a fair trial, rather than under the confrontation clause. Using this approach, he also found the evidence to be admissible. In a separate opinion, Justice Blackmun, joined by Chief Justice Burger, said that any possible error in the admission of this evidence was harmless. Both justices, however, also joined Justice Stewart's opinion. Thus, although the issue was clearly presented, there was no clear resolution of the problem of the interaction of the admissibility of a coconspirator's statement and the confrontation clause.[11]

The Supreme Court's most recent pronouncement in this area is *Ohio v. Roberts,* 448 US 56, 100 S Ct 2531, 65 LEd 2d 597 (1980), involving the use of a preliminary hearing transcript rather than the witness herself at defendant's trial. The court upheld the admission of the testimony, setting forth a two-stage analysis: (1) a finding that the hearsay declarant is unavailable; and (2) a finding that the statements possess "adequate 'indicia of reliability.'" 448 US at 66. The court noted that reliabilty can be inferred where the evidence falls within a firmly rooted hearsay exception, but in other cases there must be particularized guarantees of trustworthiness before the evidence can be admitted.

---

[11] As Rehnquist, J., notes in *Texas v. Brown,* 460 US 730, 103 S Ct 1535, 75 L Ed 2d 502 (1983), a four-person plurality is not binding precedent.

■    In the present case, defense counsel himself reported to the trial court that Whitney was unavailable to testify, because counsel heard through Whitney's counsel that Whitney was planning to assert his constitutional right against self-incrimination. Under our case law, an actual assertion of this privilege will make the declarant unavailable.[12] *State v. Rawls,* 252 Or 556, 451 P2d 127 (1969). Defense counsel did not call Whitney and make a record of this claim of privilege, stating that he believed it would be unethical to do so in open court. Without deciding whether this is a correct assessment of the situation, we suggest that such a claim of privilege should be made part of the record. This could be done outside the presence of the jury to obviate any possible ethical problems. It has been suggested that the state should immunize a coconspirator, forcing him to testify, so there is no hearsay offered and thus no conflict with the confrontation clause. *See, Dutton v. Evans, supra,* 400 US at 101 n.2 (Marshall, J., dissenting); *United States v. Yates,* 524 F2d 1282, 1286 (DC Cir 1975).

The state was not responsible for Whitney's unavailability, and defendant has never asserted that Whitney was or should have been available during this trial, so we also assume that Whitney was unavailable.

Some circuits have held that a statement by a coconspirator is a firmly rooted hearsay exception, and as such, no proof of further guarantee of trustworthiness is needed. *United States v. Peacock,* 654 F2d 339, 349 (5th Cir 1981); *United States v. Papia,* 560 F2d 827, 836 n. 3 (7th Cir 1977); *Ottomano v. United States,* 468 F2d 269, 273 (1st Cir 1972) *cert den* 409 US 1128, 93 S Ct 948, 35 LEd 2d 260 (1973).

■    However, most circuits conclude that a case-by-case examination is required to ascertain whether a defendant's right of confrontation is abridged by the admission of this type of hearsay evidence. Generally four reliability factors are considered. As recently stated in *United States v. Fleishman,* 684 F2d 1329, 1339 (9th Cir 1982):

---

[12] The present statute specifically mentions this instance. OEC 804:

"(1) 'Unavailability as a witness' includes situations in which the declarant:

(a) Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of a statement."

"The four reliability factors discussed in *Dutton* [400 US at 88-89] and *Perez* [*United States v. Perez*, 658 F2d 654 (9th Cir 1981)] are: (1) whether the declaration contained assertions of past fact; (2) whether the declarant had personal knowledge of the identity and role of the participants in the crime; (3) whether it was possible that the declarant was relying upon faulty recollection; and (4) whether the circumstances under which the statements were made provided reason to believe that the declarant had misrepresented the defendant's involvement in the crime. *Perez*, 658 F.2d at 661. The reliability factors discussed in *Dutton*, however, are not to be considered exhaustive, nor are all factors required to be present in order to admit the declarations. *Id.* An additional factor, sometimes discussed and its relevance debated, is whether the testimony of the coconspirator was 'crucial' or 'devastating.' "

It is important to note that a statement does not need to meet all four factors to be admissible. *Perez, supra,* 658 F2d at 661.

The statements supposedly made by Whitney and repeated by Freer, to which defendant objected, are:

"He [Whitney] told me [Freer] that by taking care of the situation for Curt [Farber] with Skip [Foss] that that debt would be cancelled and they would get a sum of money.

"* * * * *

"Well, he had said that Curt's man was coming back to town and would be looking for him to get the money from him.

"* * * * *

"Well, he was supposedly back in town trying to locate Curt and Mark [Whitney] and I talked about after leaving Beaver Creek up there, and going and locating him in town and staking out there to see what type of habits he had.

"* * * * *

"He said he was going to have to, you know, try to scare this guy away from Curt or else have to shoot him."

In response to a question about the source of the money Whitney had following the meeting with Farber after the shooting, Freer answered:

"Well, he had told me that he had gotten it from Curt and his debt was all cancelled."

The statements supposedly made by Whitney and repeated by Fouts are as follows:

> "Mark had told me and Kevin [Freer] both that he was — that Curt was going to pay him $14,000 to have his man killed. To knock him off is how he said it.
>
> "* * * * *
>
> "He told me that everything was a go ahead and that he had got the contract from Curt and that they were going to be real busy. And talked about how they were going to stake out Curt's man and stuff like that."

The first question to be asked is whether these seven statements are assertions of past fact, for if they are there is a chance that a jury would give them "undue weight." *See Dutton, supra,* 400 US at 88-89. An examination of these statements reveals that only the last statement that Freer repeated, about the source of the money and the cancellation of the debt, is an assertion of past fact; all of the others center on Whitney's plans for the future.

The second factor is whether the declarant had personal knowledge of the identity and role of the participants in the crime. This factor is easily satisfied; Whitney was the declarant and he knew both Farber and Freer well and was aware of the roles they were playing. Defendant could not contend otherwise.

The third factor is the one relied on heavily by defendant: whether it was possible that declarant was relying on faulty recollection. Defendant argues that because Whitney was an admitted drug user, and there was testimony that he used cocaine heavily throughout this conspiracy, his recollection should not be trusted. Even though there was no testimony about the effect of cocaine on a person's memory, the evidence about his drug use might raise valid concerns if Whitney were actually relying on his memory as a basis of making these statements. As discussed above, six of the seven statements objected to are actually statements of future plans, rather than assertions of past facts. The jury was made well aware of Whitney's drug use, as well as that of Freer and Fouts, and could consider this fact when it weighed the testimony.

The fourth factor of the test is whether the circumstances under which the statements were made provided reason to believe that declarant had misrepresented the defendant's involvement in the crime. All of the statements objected to appear to have been made spontaneously, which give them some initial aura of credibility. In this case, the statements were made by Whitney to people he considered his friends. With the exception of the explanation of the money, the statements were made before the crime was committed. Whitney had no known motive to lie to either of these two people. It is difficult to imagine what advantage Whitney could be seeking by falsely claiming that he was involved in a conspiracy with Farber to commit murder. Most of the statements were against Whitney's penal interest. The statements revealed that Whitney was planning to murder Foss to get money, and have a debt forgiven. This is not the case in which the statements were made in order to gain an advantage, as when a person in custody makes an admission as part of a plea bargain, or makes a statement after a crime is committed to lay the blame on someone else, or at least implicate him. Only the statement concerning the source of the money was made after the crime. Even at that time Whitney did not try to shift any blame for the crime.

A possible final inquiry is whether the evidence offered is "crucial" to the state or "devastating" to the defense. Assuming, without deciding, that this inquiry is an integral part of the constitutional test, we find that this offered evidence is neither crucial or devastating. In fact, most of the statements to which defendant objects are merely cumulative.

In earlier testimony, Freer testified without objection about the following conversation in the restaurant following the murder:

> "Mark told him that we had got rid of the body. And Curt looked at him and just kind of shrugged his shoulders and something to the effect, 'I don't have to think about that anymore,' or 'That's done.' Something like that. Then I excused myself to go to the bathroom. Then when I came back from there they were ready to go. So we went out to the car."

He then described the episode about the money, also without objection:

"[State] Now, about how much money did Mark have when you went to the restaurant?

"[Freer] Not much. Just a little bit over what we needed to pay for our meal.

"* * * * *

"As we were driving away he [Whitney] pulled his wallet out from underneath the arm rest on the seat and placed a wad of money in it.

"* * * * *

"[State] How much?

"[Freer] I believe it was either five hundred or a thousand."

Fouts also testified without objection that Farber had revealed to her plans for the coming murder:

"He [Farber] was going to have to pay him [Foss] the amount of money that the drugs cost that was fronted to him, or else take care of the guy; because they thought — he thought that maybe the guy had fronted it to him and then stole it back from him."

She described another conversation between Whitney and Farber:

"[Fouts] They talked about that they were either going to have to pay the supplier back or have him killed. Knock him off is how they said it.

"[State] Was there — when the defendant was present, let's restrict it to this, again. Was there any further discussion of any kind of plans, preliminary plans for that, any speculation plans that they were engaging in about where or how or what steps were going to be taken or anything like that?

"They just said that they talked about staking out the — their man, the supplier, and watching him to figure out when they would do it, if they did do it."

Fouts further explained:

"Just that they were going to have to stake the house out and that Mark — Mark told — said that he was going to get — talk with Curt about money, about how much he was going to get paid for it.

"They talked about that Mark was going to need money to buy things to take care of him with."

The evidence that defendant objected to did not give much new information to the jury and could not be described as either crucial or devastating. The jury had heard through earlier testimony that defendant and Whitney had discussed plans to kill Foss, and that Whitney would get paid for his part of the plan. It further heard that Whitney had a large amount of unexplained cash following his meeting with defendant after the killing.

Weighing the factors the United States Supreme Court in *Dutton, supra,* 400 US at 88-89, has denominated as significant, we find that the evidence defendant objects to, statements made by a coconspirator, is admissible, even in light of the confrontation clause.

■ The last matter for our consideration is whether the statements were made during the course and in furtherance of the conspiracy.[13] The statute in force at the time of the trial[14] only requires that a statement relate to the conspiracy, but cases interpreting the statute make it clear that a statement made after the conspiracy ended is inadmissible under this coconspirator's exception. *State v. Hinkle,* 33 Or 93, 97-98, 54 P 155 (1898); *State v. Magone,* 32 Or 206, 209, 51 P 453 (1897). The statement must be in furtherance of the common design. *State v. Boloff,* 138 Or 568, 596, 4 P2d 326, 7 P2d 775 (1932).

There is no problem with the statements Whitney made to Freer, for they are coconspirators and these statements all concerned the conspiracy plan.

■ The statements made to Fouts and repeated by her present a different problem. There is some authority that statements made to those who are not involved in a conspiracy are not "in furtherance" of it. *United States v. Gibbs,* 703 F2d 683, 690 (3rd Cir 1983). Without so deciding, we hold that even if the statute applicable at this trial would result in these

---

[13] This issue was not raised at trial, nor argued at the Court of Appeals. This court raised the issue sua sponte in letters to the counsels. The counsels responded with oral argument, but without written memoranda.

[14] *See* n. 4, *supra.*

two statements being inadmissible because they were not made in furtherance of the conspiracy, any error was harmless. *State v. Van Hooser,* 266 Or 19, 25-26, 511 P2d 359 (1973).

Affirmed and remanded for resentencing.