436 September 17, 2025 No. 815

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHRISTOPHER DANIEL ANDERSON,
*Defendant-Appellant.*

Yamhill County Circuit Court
22CR45405; A182977

Ladd J. Wiles, Judge.

Argued and submitted June 2, 2025.

Sara F. Werboff, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Greg Rios, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Egan, Judge, and Pagán, Judge.

EGAN, J.

Reversed and remanded.

**EGAN, J.**

Article I, section 11, of the Oregon Constitution guarantees a criminal defendant the right "to meet the witnesses face to face." That right to confrontation means that the state is generally prohibited from introducing the reliable hearsay statements of an absent declarant, unless the state can establish that the declarant is "unavailable." *State v. Belden*, 369 Or 1, 9, 499 P3d 783 (2021). In this case, defendant entered a conditional guilty plea to attempted second-degree kidnapping, ORS 161.405, ORS 163.225, reserving the right to challenge on appeal the trial court's ruling that the complainant, BF, was "unavailable." And, in his sole assignment of error, he does just that—arguing that the state failed to establish that BF was unavailable because (among other things) it failed to make adequate attempts to contact her at her boyfriend's residence. We agree and, therefore, reverse and remand.

## I.   BACKGROUND

The relevant facts are undisputed. The grand jury returned the indictment in this case in September 2022, and trial was initially set for May 16, 2023.  Prior to trial, the state moved to postpone the trial so that it could make additional efforts to produce BF. Defendant objected to the continuance but also maintained that BF was not unavailable because the state had not made adequate efforts to produce her for trial. The court held a hearing to determine whether BF was unavailable and whether to grant the state's motion. The court determined that she was not unavailable and granted the state's motion to postpone trial so that it could take additional steps to secure BF's attendance at trial. The next unavailability hearing occurred on September 28, 2023, and that hearing resulted in the trial court ruling that BF was "unavailable." We describe the evidence produced at both hearings.

A.   *Hearing on May 16, 2023*

The state presented evidence showing that BF is no stranger to the criminal justice system herself. In 2021, the Yamhill County Circuit Court revoked BF's probation and sentenced her to jail. A Yamhill County probation

officer was assigned to her for the duration of her jail term. Following that jail term, BF was supposed to be transported to Polk County to serve a jail term there as well. However, the Yamhill County Jail released BF due to medical issues and directed her to report to her probation officer. She never reported to her probation officer and never turned herself in to serve her Polk County jail sentence. BF's probation officer testified that he had not seen or heard from BF since 2021, that he had no contact information for her whatsoever, and that she had—at the time of the hearing—an outstanding warrant from Polk County.

Yamhill County Deputy Sheriff Shante Navarro testified that, since the filing of this case, she had been making contact with BF every couple of months up until January 2023, when Navarro lost contact with her. Since then, "probably every couple of weeks," Navarro would "just drive[] by" places that BF was known to frequent "or tried to see where she was." Additionally, she called all of the phone numbers she had on file for BF and her mother and checked "all known associates' addresses," but she could not locate BF.

On the day before the May 16 hearing, local police coincidentally pulled defendant over and, during that stop, asked defendant if he knew where BF could be found. The officers followed up on defendant's suggestions but were unsuccessful in locating BF.

The prosecutor represented to the court that victim services advocates had attempted to call BF "many times" but had not reached her. On the day of the hearing itself, the prosecution also reached out to Oregon Department of Human Services (ODHS), because BF was involved with multiple juvenile dependency cases. ODHS representatives said that BF had not received any ODHS services in the "last few months," and they did not have any good contact information for her.

In the end, the trial court found that the state had failed to exhaust reasonable means of producing BF for trial, explaining that most of the state's efforts were done last minute. The court postponed trial (over defendant's

objection) to allow the state to take further steps to produce her.

B.   *Evidence from Hearing on September 28, 2023*

The second unavailability hearing occurred about four months later. The prosecution presented evidence that BF had had some in-person contact with the Oregon State Police (OSP) and ODHS since the prior hearing, but the prosecution and local law enforcement had still been unable to make contact with her.

The run-in with OSP occurred in June 2023. BF had been a passenger in a car during a traffic stop, but she fled from the scene and unlawfully entered a nearby residence. OSP arrested and cited BF for trespassing, transported her to the hospital due to a possible drug overdose, and left her there. OSP troopers did not have access to the county's subpoena system, and so they did not attempt to serve BF with a subpoena for this case. When Yamhill County sheriff's deputies arrived, they discovered that BF had fled the hospital with an IV bag still attached to her arm.

The contact with ODHS occurred the day after BF fled from the hospital. BF reported to ODHS offices, and staff served her with a subpoena and summons for a juvenile hearing on June 7, 2023. On the day of that hearing, the prosecutor's office sent a representative to attend the juvenile courtroom so that they could subpoena BF for this case. Unfortunately, BF did not appear.

As of the day of the September 28 hearing, BF still had an outstanding arrest warrant out of Polk County, where she had a 10-month jail term that she had yet to serve. The state had also sought and obtained a material witness order (though not a warrant) to ensure that she would be subpoenaed to appear if she were ever taken to jail. The prosecution's remaining efforts were largely confined to calling BF on the phone and driving by places where she had stayed or spent time—all without success. Because it is important to our disposition in this case, we discuss the specific efforts made at two locations in detail.

        The state was aware of two addresses associated with BF on Ford Street in McMinnville: 725 Ford Street and 913 Ford Street. As recently as November 2022, BF had told the DA's office that she lived at 725 Ford Street. However, when law enforcement later visited that address, the occupants who answered said that they had lived there for the last four years and that they did not know BF. Thereafter, the prosecutor's office made additional attempts to contact BF at that address but never succeeded.

        As for 913 Ford Street, an apartment at that address was the home of Brian Kinslow, whom BF was dating for some period of time during the summer of 2023. Navarro had unsuccessfully attempted to serve BF with a civil subpoena at that address on February 19, 2023. But in May 2023, police visited that address to investigate Kinslow for criminal activity. When they did so, BF fled out the back window of Kinslow's apartment. In July 2023, Navarro returned to that address and knocked on the door, but no one answered. Navarro talked to a neighbor, who said that they had seen BF at the apartment the day before. The neighbor explained that every time someone knocks on Kinslow's door, BF flees out the back window. Lastly, on the day before the unavailability hearing, Navarro drove past 913 Ford Street, but she did not knock on the door, did not talk to anyone, and did not see BF. The prosecution made no other efforts to contact BF at Kinslow's residence. The prosecutor explained the reason for its minimal efforts at that location:

    "[PROSECUTOR:]  [S]o in relation to Mr. Kinslow and we, you know, we're talking about that residence, so Mr. Kinslow is under indictment for felony charges arising out of that May 31st incident, we have requested permission from his attorney to ask him about [BF's] whereabouts, we have not received permission, *** also I don't think it's a reasonable expectation that the State would send officers to a represented defendant's residence to ask about a witness or to knock on the door without permission from his defense attorney, so I would—I do want to make sure that's clear for the record, in relation to that residence is the only one where there's, you know, some recent indication that she's been staying there last, you know, she was seen there by the neighbor and the police in May and July, but I do want to make sure it's clear that Mr. Kinslow who

is the occupant there is under indictment and we have not been given permission by his attorney to contact him in any way."

Based on that evidence (and some other small efforts not recounted here), the prosecutor argued that the state had exhausted all reasonable means of producing BF for trial. He said that "Mr. Kinslow is not a viable path at this point, we have made efforts to locate her there," and he emphasized that BF has had "warrants out forever" and "very, very actively evad[es] law enforcement." The prosecutor characterized the state's efforts as "extraordinary" and "above and beyond" what was required to show unavailability. He maintained that there were no other viable options for the state, and he emphasized that "having her arrested and held in the jail is not and never has been considered a reasonable effort that the State is expected to make to show that a witness is unavailable."

The trial court rejected the state's point that arresting BF would be unreasonable given that she was a fugitive:

"THE COURT: *** [C]ome on, she's got warrants already, what's *** unreasonable about you applying for a material witness warrant for the trial setting that's coming up so you know for sure she'll be held for your case, that's reasonable, don't tell me it's not ***."

Nevertheless, taking a holistic view of the state's efforts up to that point, the trial court concluded that the state had established BF's unavailability:

"[THE COURT:]   [T]he State has to exhaust all reasonable means to procure the attendance of the witness and in this case I really can't think of anything more they could have done for this particular trial setting. Material witness warrant could have been issued and issued earlier and for an earlier trial setting because her lack of cooperation was known for months, but there were already warrants for her arrest, so the existence of an additional warrant is no guarantee that she would be here, the State Police could have done what I think they are supposed to do, which is hold onto [BF] when they had her in their custody; that didn't happen. And then, well, I don't know what sort of magic DHS pulled to get [BF] to surrender herself to their subpoena, but, you know, the biggest issue for the State to overcome is the fact

that the State Police had her in their grasp with active warrants and opted not to detain her long enough or to monitor her long enough for local law enforcement to get there and that occurred at an earlier time and I don't think changes sort of this Thursday morning quarterbacking here several months later I don't think changes the fact that [BF] is unavailable here today, she's—she runs from the police, doesn't make herself available to the District Attorney's Office, gives bogus addresses, multiple phone numbers, is not active on social media, at this point I do find that the State has exhausted the reasonable means of producing the witness to no avail and, thus, she is unavailable."

We review that ruling for legal error. *Belden*, 369 Or at 11.

## II.  ANALYSIS

Article I, section 11, guarantees a criminal defendant the right "to meet the witnesses face to face," which means that the state is generally prohibited from introducing the hearsay statements of an absent declarant—that is, unless the state can establish that (1) the declarant is "unavailable," and (2) the statements bear adequate indicia of reliability. *Belden*, 369 Or at 9. That exception to the confrontation guarantee is rooted in "'the simple principle of *necessity*—*i.e.*, the absence of any other means of utilizing the witness' knowledge.'" *State v. Harris*, 362 Or 55, 62, 404 P3d 926 (2017) (quoting *State ex rel. Gladden v. Lonergan*, 201 Or 163, 182, 269 P2d 491 (1954) (emphasis in *Lonergan*)). Thus, it applies only "'when a witness is truly unavailable to testify at trial'" and the use of the evidence without confrontation is "'genuinely necessary.'" *Id*. (quoting *State v. Herrera*, 286 Or 349, 355, 594 P2d 823 (1979)). As the Oregon Supreme Court has summarized:

> "The constitutional confrontation guarantee requires the state to do more than select one from any number of reasonable means of securing the presence of a witness and call it a day. Reliance on hearsay in lieu of live testimony must be a matter of 'necessity.' The state must have exhausted all reasonably available means of producing the witness."

*Id*. at 66.

Here, the prosecution pursued a variety of efforts to produce BF. Staff repeatedly called her at numerous

numbers. Deputies repeatedly drove by various places that she was known to frequent. The state obtained a material witness order in case she was arrested, so that the jail would know to serve her with a subpoena. Someone attended a juvenile hearing, hoping that BF might attend. Yet BF clearly did not want to be found. BF was a fugitive with warrants and a 10-month unserved incarceration term hanging over her head. She escaped from hospitals, trespassed into a stranger's house, and jumped out of windows—all to avoid interactions with the police.

But the state's burden to prove unavailability is a heavy one. The question is not whether the state made a large number of reasonable efforts to secure BF's attendance at trial or even whether "additional measures are *likely* to produce the witness for trial;" the question is whether there remains a "measure [that] is 'reasonably available' for producing the witness," which the state has not exhausted, and which is not futile. *Belden*, 369 Or at 22 (emphasis in original). Put differently, "[a]t a minimum, *** the state must make some showing as to measures that are specifically identified during the course of the hearing—either a showing that it has exhausted those measures or a basis on which to conclude that the measures are not reasonably available for producing the witness." *Id.* at 21. Although defendant identifies various measures that the state failed to exhaust or things that, in retrospect, the state should have done differently, we limit our focus to a single measure that the state left unexhausted and that was not futile.

Despite all of the failed efforts to contact or locate BF, she was found at Kinslow's residence on one instance in May, and a neighbor reported that she was there again in July. In fact, in law enforcement's three visits to that residence between February and July 2023,[1] BF was either present or recently present on two of those occasions. Furthermore, there was no evidence to suggest that she no longer frequented that residence or that she had broken up

---

[1] We do not count Navarro's drive by in September because it is unclear what if anything she expected to gain by simply driving by the residence without at least knocking on the door. At oral argument, even the state seemed to agree that the drive by bore little weight in the analysis.

with Kinslow. Instead, it was the most promising lead on locating BF and clearly not a futile place to search for her.

Despite that promising lead on BF, law enforcement never knocked on the door again after the July visit. Typically, that would be enough for us to conclude that the state failed to bear its burden. We pause, however, to address the state's reason for not making further efforts at that address. The state argued that it was not a reasonably available means of producing BF because Kinslow was under indictment and represented by counsel. Because Kinslow's counsel had not given the state permission to speak with Kinslow about BF's whereabouts, the state concluded that nothing more could be done.

We disagree. Certainly, because Kinslow was represented by counsel in a criminal case, police were prohibited from questioning him about the prosecution. *See, e.g.*, *State v. Benton*, 371 Or 311, 319, 534 P3d 724 (2023) (recognizing that police may not question a represented criminal defendant about the crime without first notifying their lawyer). But nothing prevented law enforcement from knocking on the door to ask for and talk to BF, from just knocking on the door and watching for her escaping out the window, from asking neighbors to notify police if she were seen, or from perhaps even pursuing an arrest warrant for BF at that residence. We stress, of course, the fact that BF was not just a reluctant witness. She herself was a fugitive. So while we may debate whether taking a reluctant witness into custody so that they may be produced at trial is a "reasonably available means" of producing them, there was nothing unreasonable about arresting BF on her outstanding criminal warrants or pursuing her as the police would pursue any other fugitive—understanding that if BF were arrested and serving her 10-month incarceration sentence, she would also be available to testify.

In short, Kinslow's residence was a promising lead for contacting BF and significantly more could have been done to contact her there. Therefore, the state failed to establish that it had exhausted all reasonably available means of producing BF, and the trial court erred in finding that she was unavailable.

Reversed and remanded.