Argued and submitted March 18; decision of Court of Appeals reversed, judgment of circuit court reversed, and case remanded to circuit court for further proceedings December 2, 2021

STATE OF OREGON,
*Respondent on Review,*

*v.*

KYLE ALLAN BELDEN,
aka Kyle Allan Beldan,
*Petitioner on Review.*

(CC 16CR55568) (CA A163905) (SC S067922)

499 P3d 783

The state subpoenaed the alleged victim to testify at defendant's trial for fourth-degree assault constituting domestic violence, but she did not appear as directed and did not answer a knock on her door around the time she was directed to appear. In a hearing about an hour later, the state argued that the witness was "unavailable" for purposes of the exception to Oregon's Article I, section 11, confrontation right allowing admission of reliable hearsay statements that are genuinely necessary because a declarant is unavailable to testify. Defendant argued that the state had not demonstrated that the witness was unavailable and dismissed the trial court's offer of a short continuance. The trial court concluded that the witness was "unavailable" and admitted hearsay statements in lieu of the witness's live testimony. Defendant was convicted, and the Court of Appeals affirmed. *Held*: (1) Whether the state has met its burden to prove constitutional "unavailability" is a question of law; (2) the state's burden, which requires the state to demonstrate that it has exhausted reasonably available measures for producing the witness, extends to measures that are reasonably available after the witness failed to appear and may include measures that would require a delay of the trial; (3) defendant's objection to a continuance does not entirely preclude him from challenging whether the witness was "unavailable"; and (4) under the circumstances of this case, the witness was not "unavailable" because the state failed to demonstrate that it exhausted measures for producing the witness that were reasonably available after she failed to appear and that would not have required a delay of trial.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

En Banc

On review from the Court of Appeals.*

_____

* Appeal from Multnomah County Circuit Court, Stephen K. Bushong, Judge. 303 Or App 438, 464 P3d 465 (2020).

John Evans, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender.

Gregory A. Rios, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

FLYNN, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Balmer, J., dissented and filed an opinion, in which Nelson and Garrett, JJ., joined.

**FLYNN, J.**

At issue in this criminal case is Oregon's constitutional guarantee that an accused will have the right "to meet the witnesses face to face." Or Const, Art I, § 11. When this court last considered Oregon's Article I, section 11, "confrontation right," we emphasized that the right has never been understood to bar the use of reliable hearsay statements if the declarant "'is truly unavailable to testify at [a] trial.'" *State v. Harris*, 362 Or 55, 62, 404 P3d 926 (2017) (quoting *State v. Herrera*, 286 Or 349, 355, 594 P2d 823 (1979)). To rely on hearsay in lieu of live testimony, however, "the state must show that it is unable to produce a witness after exhausting reasonable means of doing so." *Id.* at 57. Given that standard, this court in *Harris* "reject[ed] the state's contention that the unavailability requirement of Article I, section 11, is satisfied when a witness fails to comply with a subpoena." *Id.* at 67. For procedural reasons, however, *Harris* did not address the defendant's arguments about additional measures that the state could have taken "[o]nce the state became aware that its witness would not appear." *Id.* at 57, 66-67. This case presents another opportunity to address how the state meets its burden to show that it has exhausted reasonably available means of producing a witness when that witness has been served with a subpoena but fails to appear.

The witness at issue in this case was the alleged victim, C. The state had served C with a subpoena to appear at 8:15 a.m. on the first day of defendant's trial, but she did not appear. Later that morning, the state asked the trial court to conclude that C was "unavailable" for purposes of the exception to Article I, section 11, and, on that basis, to allow the state to rely on hearsay statements in lieu of C's live testimony at trial. The trial court granted the state's motion after conducting a hearing that lasted through the morning, and the Court of Appeals affirmed. *State v. Belden*, 303 Or App 438, 464 P3d 465 (2020). The hearing record reveals, however, that—despite the fact that defendant and the state's own witnesses identified additional measures that were available for producing C as a witness— the state offered no evidence that it had attempted any of those measures after C failed to appear and no evidence or

explanation that pursuing those measures would have been unreasonable. Under the circumstances, we conclude that the state failed to show that it had "exhausted all reasonably available means of producing the witness." *See Harris*, 362 Or at 66. Although we recognize that the record below developed without the benefit of this court's decision in *Harris*, the state's failure to make the showing that this court has required means that the state failed to prove that C was "unavailable" for purposes of overcoming defendant's Article I, section 11, confrontation right.

## I.   FACTS

The pertinent facts are undisputed. A passerby, Laherty, was walking near the house that defendant and C shared when she heard a cry for help. Laherty approached the house, saw C in the doorway, and observed that C was naked, shaking, and bleeding. Laherty also observed other marks on C that looked to Laherty "like someone had been hitting" her. Laherty tried to guide C out of the house, but C would not go.

During the course of that interaction, C made statements to Laherty that are at the heart of the "confrontation right" dispute in this case. C told Laherty that she—C— was the person who had yelled for help, that she had been assaulted by a person who was "hiding in [her] daughter's bedroom," and that she did not want Laherty to call the police.

Another passerby called police, who came to the house and arrested defendant. The state charged defendant by information with misdemeanor fourth-degree assault constituting domestic violence.[1] *See* ORS 163.160 (defining misdemeanor and felony versions of fourth-degree assault); ORS 132.586 (providing that, if a crime is pleaded and proven to satisfy the statutory definition of "domestic violence," then "the words 'constituting domestic violence' may be added to the title of the crime").

Between the time of the assault and the date of defendant's trial, the office of the district attorney (DA) was

---

[1] The state also charged defendant with second-degree criminal mischief and harassment but ultimately dismissed those charges.

in contact with C about her role as a witness against defendant. Beginning on September 9, less than a week after the assault, representatives of the DA's office began to contact C. They left multiple phone messages for C and spoke with her by phone several times. In one phone conversation, a victim's advocate from the DA's office explained the "criminal justice process" to C.

On October 6, an intern from the DA's office attempted to personally serve C with a subpoena as she left a court hearing, but C brushed past and left the courtroom. Four days later, however, C told the victim's advocate that she would attend trial if needed and that she might be interested in a phone conference with the prosecutor who was assigned to defendant's case. But C next spoke to the victim's advocate on November 1 and, in that conversation, told the victim's advocate that she wanted no further contact.

The day after C told the victim's advocate that she wanted no further contact, C made a similar statement in a phone conversation with Jones, whose duties for the DA's office included serving subpoenas for the domestic violence unit. C told Jones, "I've asked you guys not to call me anymore." At some point, Jones had learned that C had a probation officer and "tried to get in touch with" the probation officer "to try to get some help serving [C]," but the record does not reveal the outcome of that attempt. The record does reveal that the day after C told Jones not to call anymore, Jones went to C's home to serve a subpoena. When C answered the door, Jones explained that she had a subpoena for C. As described by Jones, C "looked at the subpoena. She looked at me. She said okay and closed the door." Jones then told C through the door that C had been personally served and left the subpoena in C's mailbox. That was on November 3, and there is no evidence of contact between C and the DA's office after that point.

The subpoena commanded C to appear at the courthouse on November 14—the day of trial—at 8:15 a.m. But on the morning of trial, 8:15 a.m. came and went without an appearance by C. Later that morning, the court convened a pretrial hearing at which the state attempted to demonstrate that C was "unavailable" for purposes of defendant's

confrontation rights.[2] The state called the victim's advocate, the intern from the DA's office, and Jones to testify to the measures described above, which the DA's office had taken pretrial in an attempt to produce C as a witness at trial. Jones also testified that she had gone to C's house at about 8:20 a.m. that morning—when C should have been arriving in court—and had gotten no answer when she knocked on the door. The state argued that, in this case, it had "done everything in its power" to produce C as a witness, "short of physically barging into her house and arresting her." The state urged the court to conclude that C, therefore, was "unavailable" for purposes of defendant's constitutional rights and that C's hearsay statements to Laherty should be admitted as satisfying the "excited utterance" exception to the hearsay rules, OEC 803(2).[3]

Defendant did not dispute that C had been personally served with the subpoena, and he acknowledged the other measures that the state had taken to maintain contact with C pretrial. He argued, however, that "the test for unavailability is ultimately one of necessity" and that the state had not made that showing. Defendant first argued that the state "was not unable to reach [C] via phone call," emphasizing testimony that, if C's number had been changed or disconnected, that usually would have been noted in the DA's system.

Defendant then questioned the state's assumption that C was absent because she was refusing to appear. He pointed to the testimony that C had expressed some willingness to attend trial, and he argued that there did not appear to be any "affirmative statements made by [C] stating she will not show up, that she will not testify, that she will not cooperate." Defendant also referred to evidence that the subpoena had directed C to appear in courtrooms that were not

___

[2] In addition to the confrontation right guaranteed by Article I, section 11, the Sixth Amendment to the United States Constitution also guarantees a "confrontation" right. Both provisions were at issue in the trial court, but only the Oregon Constitution is at issue on appeal.

[3] OEC 803(2) provides an exception to the rule against the admission of hearsay evidence for "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

"this courtroom" and argued that "[i]t's unclear whether or not maybe [C] appeared in either of those courtrooms."[4]

Finally, defendant argued that the state "has a number of resources."[5] He specifically pointed to Jones's testimony that C "has a probation officer," and he complained that "there's been maybe one attempt, arguably, made to contact her probation officer."[6] Thus, defendant insisted, the state had "not met its burden in terms of procuring" the witness.

The trial court interrupted at that point to ask if it should "grant [the state] a continuance and have them send an officer out and see if they can round her up and bring her in and we can start this trial at 1:30." But defendant dismissed that offer, emphasizing "that this is the date and time for trial" and that the state had not met its burden of showing that C was "unavailable." After that exchange, the focus of the hearing turned to argument and testimony regarding whether the challenged statements qualified for admission under the hearsay rules and the federal constitution, and neither the court nor either party returned to the possibility of measures that could be pursued with a continuance.

Ultimately, the trial court provided a lengthy oral ruling in which it concluded that C's hearsay statements to Laherty qualified as "excited utterances" and that C was "unavailable" for purposes of defendant's confrontation-rights objection. The trial court, which did not have the

---

[4] Defendant made clear that he was not challenging the validity of the subpoena and did not explain the courtroom discrepancy in detail. But defendant had elicited testimony from Jones that the subpoena commanded C to appear in courtroom 804, and the trial court record indicates that trial was held in courtroom 450. The state did not address the asserted courtroom discrepancy at all.

[5] One of the "resources" that defendant identified was an order under the "material witness statute," but defendant withdrew the argument when the trial court pointed out that the statute does not provide for such orders in cases like this—a misdemeanor charged by information. *See* ORS 136.608 (describing case types in which the DA or the defendant may apply for a material witness order and excluding misdemeanors charged by information).

[6] Defendant appears to have described the probation officer as a resource that the state could have better utilized before trial—"It could have reached out to her PO more regularly"—and "instead of sending an investigator" to C's house "at 8:20 [a.m.] during a time where she would arguably be commuting to court or already present at court."

benefit of this court's decision in *Harris*, focused on the fact that the state had made "a number of efforts" to try to get C to appear, including serving a subpoena, and it reasoned "that the only logical inference" was that C was refusing to cooperate. On that basis, the court concluded that C was "unavailable." After concluding its ruling on the hearsay statements, the trial court announced that they had "made it to 12 o'clock" and that court would be in recess until 1:30 p.m., at which point the court planned to begin jury selection.

After a short trial, the jury convicted defendant of fourth-degree assault constituting domestic violence, and he appealed. Defendant primarily assigned error to the trial court's admission of the three hearsay statements that C made to Laherty, arguing that the state did not demonstrate that C was "unavailable" for purposes of Article I, section 11.[7] Defendant argued that the state failed to exhaust reasonable efforts that could have included reaching out to C's probation officer to help convince her to appear and initiating contempt proceedings. The state responded that defendant's objection to a continuance precluded him from challenging the state's proof that C was "unavailable" and that, in any event, the state's efforts to secure C's appearance had been sufficient to establish that C was "unavailable."

The Court of Appeals affirmed. *Belden*, 303 Or App at 447. But the court first rejected what it described as the state's "invited error" argument, concluding that defendant's objection to the continuance did not preclude him from challenging the state's proof that C was "unavailable." *Id.* at 445. The court also concluded, however, that measures the state could have initiated only "*after* C failed to comply with the subpoena" were essentially irrelevant because the trial court's "analysis of whether the absent witness was 'unavailable' necessarily could only have included the state's *pretrial* efforts." *Id.* at 446 (emphases in original). Ultimately, the court held that the state's "efforts were reasonable and reflected an overall approach, carried out in good faith, to

---

[7] Defendant also raised an unrelated assignment of error that he does not reprise before this court.

secure C's live testimony. Nothing more was required."[8] *Id.* at 447. On defendant's petition, this court allowed review.

## II.   DISCUSSION

On review in this court, defendant renews his arguments that the state's reliance on C's hearsay statements in lieu of live testimony violated his right to confrontation under the Oregon Constitution because the state had not "exhausted all reasonably available means of producing the witness." *See Harris*, 362 Or at 66. Before turning to the arguments in detail, we describe the nature of the constitutional right that is at issue, and we also briefly address the standard of review.

### A.   *The Article I, Section 11, Confrontation Right*

Article I, section 11, of the Oregon Constitution guarantees a criminal defendant the right "to meet the witnesses face to face." But that right is not absolute. Rather, this court has repeatedly concluded that the right "must be construed in light of certain well-established exceptions that existed at common law," including an exception that permits the use of certain "prior out-of-court statements that are 'necessary' because of the 'unavailability' of the declarant." *Harris*, 362 Or at 61-62.

Beginning with this court's 1985 decision in *State v. Campbell*, we have applied, on "independent and separate state grounds," a two-part test for admitting hearsay testimony over a confrontation-rights objection that was initially articulated by the United States Supreme Court: "First, the declarant must be unavailable and, second, the declarant's out-of-court statements must have 'adequate indicia of reliability.'" 299 Or 633, 648, 705 P2d 694 (1985) (citing and quoting *Ohio v. Roberts*, 448 US 56, 66, 100 S Ct 2531, 65 L Ed 2d 597 (1980), *overruled by Crawford v. Washington*, 541 US 36, 43-50, 124 S Ct 1354, 158 L Ed 2d 177 (2004)). Notwithstanding intervening changes in the United States

---

[8] In describing the measures that the state had taken, the Court of Appeals opinion recites that "the state did, in fact, contact C's probation officer to discuss the need for C's testimony." *Belden*, 303 Or App at 446. The parties agree, however, that the evidence shows only that an employee of the DA's office had "tried to get in touch" with C's probation officer and that the trial court expressly found that there was no evidence of the state actually contacting the probation officer.

Supreme Court's Sixth Amendment analysis, on which *Campbell* had relied, this court continues to adhere to the two-part test to interpret and apply the Article I, section 11, confrontation guarantee. *Harris*, 362 Or at 64; *see also State v. Moore*, 334 Or 328, 340-41, 49 P3d 785 (2002) (reaffirming the *Roberts* test for analysis under Article I, section 11, despite intervening shifts in the Court's interpretation of the Sixth Amendment, after considering the provision's text, its historical purposes, and prior case law interpreting it).

Only the first prong of the two-part test—"unavailability"—is at issue in this case.[9] We explained in *Harris* that our prior cases addressing the "unavailability" exception to the Article I, section 11, confrontation right had "adhered to a demanding requirement of unavailability" that focused on "'necessity as the justification for admitting hearsay against a criminal defendant, once confrontation became impossible.'" 362 Or at 65 (quoting *Moore*, 334 Or at 339, and *State v. Birchfield*, 342 Or 624, 629-30, 157 P3d 216 (2007)). Quoting our earlier decision in *Herrera*, this court emphasized in *Harris* that the "'exception cannot be granted routinely'"; that it "applies only 'when a witness is truly unavailable to testify at [a] trial'"; and that, "[b]efore the state can rely on prior out-of-court statements, it must demonstrate why the use of such evidence is 'genuinely necessary.'" *Harris*, 362 Or at 62 (quoting *Herrera*, 286 Or at 355). Elaborating on the state's burden, this court explained in *Harris* that the state may not simply "select one from any number of reasonable means of securing the presence of a witness and call it a day"; rather, the constitutional confrontation guarantee requires that the "state must have exhausted all reasonably available means of producing the witness."[10] *Id.* at 66. We emphasized,

---

[9] On appeal, defendant does not dispute that the statements qualify as excited utterances and are, therefore, "reliable" for purposes of the Article I, section 11, exception. *See State v. Moen*, 309 Or 45, 62-63, 65, 786 P2d 111 (1990) (explaining that "[n]o independent inquiry into the reliability of" hearsay statements is required for purposes of Article I, section 11, if the statements fall within a "firmly rooted hearsay exception" and describing the "excited utterance" exception as "firmly rooted").

[10] *Harris* uses multiple, slightly varied formulations to describe the state's burden, including that "the state must show that it is unable to produce a witness after exhausting reasonable means of doing so," 362 Or at 57, that the "state must have exhausted all reasonably available means of producing the witness," *id.* at 66, and that the "state must exhaust reasonably available measures for

however, that "the law does not require the state to engage in futile measures." *Id.* at 65.

We now highlight several significant aspects of that standard. First, the standard for "unavailability" does not ask whether the state has exhausted measures that are reasonably *likely* to produce the witness for trial; it asks whether the state has exhausted measures that are "reasonably *available*" to produce the witness for trial. *Id.* at 66 (emphasis added). The implication is that "unavailability" does not turn on a factual inquiry into the likelihood that a particular measure would have been successful in producing the witness. Indeed, the rule that a witness is "unavailable" only if the state shows that it has "exhausted all reasonably available means of producing the witness," *id.*, necessarily assumes that the state has exhausted means that did not succeed in producing the witness. By juxtaposing the concept that a measure would be "futile" with the concept that a measure is a "reasonably available means of producing the witness," *Harris* highlights that the likelihood of success does not necessarily determine whether a measure is "reasonably available." *Id.* at 65-66.

Second, because the standard places the burden on the state to show that it has exhausted the reasonably available measures for producing the witness, the state must do more than simply respond to measures that the trial court or the defendant have proposed. Although the fact that the court or the defendant has specifically proposed a particular measure may affect whether the measure was reasonably available, the fact is not dispositive.[11]

Finally, we emphasize that the question of whether a witness is "unavailable" for purposes of overcoming defendant's Article I, section 11, confrontation right is a question

---

producing the witness," *id.* at 67. We understand the varying formulations to capture the same constitutional requirement, and we treat them as interchangeable throughout this opinion.

    [11] In this opinion we focus on measures for contacting C that were specifically identified in the trial court. Although that is not necessarily the only category of measures that the state must address to show that it has exhausted reasonably available means for producing a witness, we share the dissent's concern that, with the benefit of hindsight, it often will be "possible to point to additional steps that the state could have taken." 369 Or at 29 (Balmer, J., dissenting).

of law.[12] It appears that we have not yet announced that standard explicitly, but in prior cases involving the Article I, section 11, right to confront witnesses, this court has treated the "unavailability" determination as a question of law. *See, e.g.*, *Campbell*, 299 Or at 652 (holding that three-year-old witness would be "unavailable" only if trial court examined and declared the child "incompetent"); *State v. Cook*, 340 Or 530, 537, 541, 135 P3d 260 (2006) (concluding that witnesses who had invoked their right against self-incrimination "were unavailable under Article I, section 11"). That approach aligns with how we review other questions that determine whether there has been a violation of a right that Article I guarantees to an accused. *See State v. Ward*, 367 Or 188, 198, 475 P3d 420 (2020) (whether the state has proven that a suspect made a knowing, intelligent and voluntary waiver of his Article I, section 12, right to counsel is "ultimately a legal question"); *State v. Maciel-Figueroa*, 361 Or 163, 176, 389 P3d 1121 (2017) (whether officers had "reasonable" suspicion to authorize investigative stop under Article I, section 9, is an "issue of law" that depends on "whether the officer pointed to specific and articulable facts that are sufficient as a matter of law to give rise to an inference that a reasonable officer would hold" a subjective belief that the defendant had committed the crime for which the officer made the stop (internal quotation marks omitted)); *State v. Boyd*, 360 Or 302, 316, 380 P3d 941 (2016) ("whether the nature of the police questioning was such that it was reasonably likely to elicit an incriminating response," such that the suspect has been subject to unlawful "interrogation" in violation of Article I, section 12, is "an essentially objective test" (internal quotation marks omitted)).

        That understanding of how we review "unavailability" for purposes of Article I, section 11, also aligns with our recent explanation for why we review as a matter of law the

---

[12] The parties in this case do not dispute that the test for "unavailability" is a question of law. But the dissent suggests that we should give a level of deference to the trial court's assessment of the components of that test—exhaustion and reasonableness—that would be inconsistent with reviewing the "unavailability" determination as a question of law. *See* 369 Or at 29 (Balmer, J., dissenting) (opining that "trial court was in a better position than this court to assess whether, given all the circumstances, the state met its burden of showing that it took all reasonable steps to secure the attendance of C").

question of whether a witness is "unavailable" for purposes of the statutory hearsay exceptions.[13] *State v. Iseli*, 366 Or 151, 161-62, 458 P3d 653 (2020). We concluded in *Iseli* that the test for statutory unavailability—whether the proponent of the hearsay statement "has been unable to procure" the declarant's "attendance by process or other reasonable means"—is a question of law because the standard "does not suggest a range of legally permissible choices"; it is "a standard that either is satisfied or is not." *Id.* at 162 (citing OEC 804(1)). Like the statutory standard for proving statutory "unavailability," the standard for proving constitutional "unavailability"—whether the state has shown that it "exhausted all reasonably available means of producing the witness," *see Harris*, 362 Or at 66—is either satisfied or is not. Given the same set of factual circumstances, the question of whether a defendant's constitutional right to confront witnesses must yield to the state's need to rely on hearsay statements does not have "a range of legally permissible choices" that may vary depending on the courtroom in which the case is tried. *See Iseli*, 366 Or at 162. As we emphasized, in *Iseli*, however, to the extent that application of the legal standard turns on disputed questions of fact, this court is bound by the trial court's findings "if supported by any evidence in the record." *See id.* at 159.

B.   *The state failed to demonstrate that C was "unavailable."*

         In this case, the relevant facts are not in dispute, so we review as a matter of law whether the state demonstrated that C was "unavailable." With respect to that question, the parties' arguments have shifted slightly from their arguments in the Court of Appeals. Defendant first urges this court to correct the suggestion by the Court of Appeals that measures available *after* a witness fails to appear have no bearing on whether the witness is "unavailable." Defendant asks us to clarify that the state's burden to show that it exhausted reasonably available measures for producing a

---

[13] We use the terms "constitutional unavailability" and "statutory unavailability" to distinguish between the two concepts. At issue in this opinion is the "unavailability" exception that this court has identified to the seemingly categorical Article I, section 11, right "to meet the witnesses face to face." The concept of "unavailability" under the hearsay rules was created and is defined by statute. *See* OEC 804(1).

witness does not end when the witness fails to appear and may include even measures that would require a delay of trial. Defendant also urges this court to conclude that his objection to a continuance presents no barrier to his arguments on appeal, in part because the state never agreed to pursue additional measures that would have required a continuance. Finally, defendant contends that the state failed to exhaust measures for producing C as a witness that were reasonably available both before and after C failed to appear and, thus, that the state failed to prove that C was "unavailable" for purposes of Article I, section 11.

In briefing to this court, the state no longer contends that defendant is barred entirely from challenging the state's proof that C was "unavailable." The state also does not defend the suggestion of the Court of Appeals that constitutional "unavailability" necessarily must be determined as of the point at which the witness fails to appear. But the state argues that, to the extent defendant is challenging the state's proof of "unavailability" by pointing to measures that the state could have taken only with a continuance of the trial, this court should conclude that defendant's challenge is precluded by his objection to a continuance in the trial court. Under the circumstances of this case, the state contends, it "demonstrated that it made all reasonably available efforts to produce the victim by subpoenaing her, contacting her multiple times, and by attempting to contact her at her house on the morning of trial to persuade her to attend." In other words, the state does not contend that measures available after the witness fails to appear are always irrelevant to the state's burden to prove that the witness is "unavailable," but it views measures that were available after C failed to appear as essentially irrelevant under the circumstances of this case.

As we will explain, we are not persuaded that the state demonstrated that C was constitutionally "unavailable" without showing that it exhausted measures that were reasonably available *after* C failed to appear, whether that is framed as a broad legal proposition or as a conclusion under the circumstances of this case. Even assuming that defendant's objection to a continuance excuses the state's failure to pursue measures that would have required a continuance,

the record reveals that the parties and the witnesses identified other measures for producing C as a witness that were available on the morning of trial. Yet the state offered neither evidence nor argument that those measures would have required a delay of trial, would have been futile, or were otherwise not reasonably available means of producing C as a witness. Under the circumstances, we conclude that the state failed to show that it had exhausted measures that remained reasonably available for producing C as a witness in the time available on the morning of trial.[14]

1. *Whether a witness is "unavailable" takes into account measures that are available after the witness fails to appear.*

We turn first to defendant's request that we "clarify" that the state's obligation to exhaust reasonably available measures for producing the witness does not end when the witness fails to appear as directed by a subpoena. Although the state does not dispute that basic proposition, the decision of the Court of Appeals could be read as holding otherwise. *See, e.g.*, *Belden*, 303 Or App at 446 (because the state's pretrial "efforts were reasonable and reflect[] an overall approach, carried out in good faith, to secure C's live testimony[,] [n]othing more is required"). To the extent that the Court of Appeals intended to announce a categorical rule that the state's obligation to show that it has exhausted reasonably available measures to produce a witness ends when the witness fails to appear as commanded in a subpoena, we reject that rule as incompatible with our existing case law regarding what it means for a witness to be "unavailable" for purposes of Article I, section 11.[15]

*Harris* is our most recent case addressing the state's burden to prove that a witness is "unavailable" for purposes of Article I, section 11, and it provides the starting point for

_____

[14] Given that conclusion, we do not decide whether a defendant who objects to a continuance is precluded from contending that the state failed to exhaust measures that would have required a continuance.

[15] It is unclear whether the Court of Appeals intended to announce a categorical legal rule regarding "unavailability" or whether the court meant only that in this case—given defendant's objection to a continuance—the inquiry was limited to measures that the state could have taken pretrial. Either way, we disagree.

our analysis in this case. In *Harris*, after the victim failed to appear at trial as directed in a subpoena, the state argued that the victim was "unavailable" for purposes of the defendant's Article I, section 11, confrontation right. 362 Or at 58. The state explained to the trial court that it had served the victim with a subpoena, had attempted to call the victim but been unable to reach her, and had spoken that morning to the victim's mother. *Id.* at 58-59. Although the state argued that its efforts up to that point demonstrated that the witness was "unavailable," it also indicated a willingness to attempt additional measures to bring the victim to court if the court were to grant a short continuance. *Id.* at 59. The defendant, however, objected to giving the state more time to produce the witness. *Id.* The trial court accepted the defendant's position as to the proposed delay and ruled that the state's pretrial efforts established that the victim was "unavailable" for purposes of Article I, section 11. *Id.* at 59-60.

In briefing to this court in *Harris*, the state had argued that measures that were available after the witness failed to appear should be irrelevant to the "unavailability" analysis, but we did not agree. Although this court ultimately affirmed the decision of the trial court in *Harris* for other reasons, we expressly "reject[ed] the state's contention that the unavailability requirement of Article I, section 11, is satisfied when a witness fails to comply with a subpoena." *Id.* at 67. And our analysis in *Harris* suggests that proving "unavailability" sometimes may require the state to pursue measures that are available only with a delay of trial. For example, we emphasized that the defendant's arguments pointed specifically to measures that would have required at least a short delay of the trial, such as initiating remedial-contempt proceedings or sending someone out to the victim's house to persuade her to attend.[16] *Id.* at 61. And we did not

---

[16] The trial court in *Harris* contemplated that a short continuance would be needed "to allow the state to take such additional steps" as the defendant had identified. 362 Or at 57. The trial court is quoted more fully in the Court of Appeals opinion as reasoning: "'If all that has happened so far is a follow up phone call we could set this to begin tomorrow *** and allow the State to do whatever further—make whatever further efforts it wishes to make at this time whether through officers that are on the case or otherwise.'" *State v. Harris*, 279 Or App 446, 451-52, 379 P3d 539 (2016), *rev'd*, 362 Or 55, 404 P3d 926 (2017).

question the merits of the defendant's suggestion that circumstances may require the state to exhaust measures that would require a delay of trial in order to demonstrate that the witness is "unavailable." *Id.* at 66-67. Instead, we held that the defendant was precluded from arguing that the state needed to pursue such additional measures because he had objected after the state had "agreed to a continuance to permit it to make further attempts to secure its witness." *Id.* "Under those circumstances," we reasoned, the "defendant is in no position to complain that the trial court erred in concluding that the victim was unavailable." *Id.* at 67.

At least implicitly, that answer to the defendant's argument in *Harris* suggests a conclusion that we now make explicit: The state's burden to prove that a witness is "unavailable" may include showing that the state has exhausted measures that were reasonably available after the witness failed to appear, potentially even measures that require a delay of the trial.[17] Any other conclusion would be difficult to reconcile with our emphasis in *Harris* that "[r]eliance on hearsay in lieu of live testimony must be a matter of 'necessity'" and that "[t]he state must have exhausted all reasonably available means of producing the witness." *Id.* at 66. Accordingly, we reject the suggestion by the Court of Appeals that whether a witness is "unavailable" must be determined on the basis of the state's "*pretrial* efforts" and that measures that could have been initiated "*after* C failed to comply with the subpoena" are irrelevant. *Belden*, 303 Or App at 446 (emphases in original). The rule, instead, depends on what measures are reasonably available "under the circumstances of the individual case." *Harris*, 362 Or at 67. The circumstance of an imminent trial may significantly affect the range of measures that are reasonably available for producing a recalcitrant witness, but knowledge that the state's pretrial measures have been ineffective at producing the witness is also a circumstance that can affect whether

---

[17] That holding is consistent with—but not controlled by—our recent conclusion that, in the context of the state's statutory obligation to prove a witness's "unavailability" for purposes of the hearsay exceptions, OEC 804(1), "other reasonable means" for procuring the witness in that case included requesting a material witness warrant or initiating remedial contempt proceedings. *Iseli*, 366 Or at 175.

it is reasonable for the state to pursue additional available measures.

    2.   *Defendant's objection did not invite error.*

       We next turn briefly to defendant's request that we "clarify" the extent to which his objection to a continuance in the trial court limits his ability to challenge the state's proof of "unavailability" on appeal. As set out above, the Court of Appeals held that defendant's objection was not "invited error" that would entirely preclude him from challenging the state's proof that C was "unavailable," *Belden*, 303 Or App at 445, and the state no longer contends otherwise. We agree with that analysis of "invited error." In general, the doctrine applies when a trial court has taken precisely the action that the party claiming error has requested the trial court to take. *See, e.g.*, *State v. Ulery*, 366 Or 500, 502, 464 P3d 1123 (2020) (explaining that "the doctrine of invited error can apply when a party requests an instruction and later assigns error to that very instruction"). To the extent that defendant challenges as error the trial court's ruling that the state proved C was "unavailable," defendant did not invite the claimed error. On the contrary, defendant opposed that ruling and is entitled to challenge it in this court.

       *Harris* does not hold otherwise. As explained above, this court held in *Harris* that the defendant was precluded from arguing that the state needed to pursue measures that would have required a continuance, because the state had "agreed to a continuance to permit it to make further attempts to secure its witness" but the defendant had objected. 362 Or at 66-67. Although we described the nature of the preclusion as "essentially invited *** error," *id.* at 67, that conclusion should be understood in the context of arguments that focused on the state's failure to request a continuance to pursue additional measures, *see id.* (explaining that, "[i]n this case, defendant objected to the state being granted the time to pursue other means of producing the victim as a witness"). Thus, immediately before describing the defendant's argument as precluded by his objection to a continuance, we emphasized that we did not understand "how the state can be faulted for failing to obtain a continuance

to pursue other means of producing the witness when defendant objected to the state being allowed to do just that." *Id.* at 66. As the state recognizes in this court, *Harris* should not be understood as holding that the defendant was precluded from challenging entirely the state's failure to exhaust measures, even those that would not have required a delay of the trial.

Defendant contends that the preclusion holding in *Harris* should be further limited to the precise facts of that case and should not apply if a defendant has a good faith basis for opposing a continuance or if the state has not affirmatively agreed to a continuance. The state insists, however, that *Harris* applies whenever a defendant who has opposed a continuance later faults the state for failing to pursue measures that would have required a continuance. As indicated above, we decline to resolve that dispute because considering the state's failure to pursue measures that would have required a continuance would not alter our conclusion in this case. Moreover, given the timing of this court's decision in *Harris*, the parties had no opportunity to create a record that would be conducive to addressing defendant's proposed construction of *Harris*. The dispute is more appropriately left to a future case.

3.  *The state failed to demonstrate that it exhausted reasonably available measures in the period after C failed to appear.*

Under the circumstances of this case, we conclude that the state failed to exhaust measures for producing C as a witness that were reasonably available after C failed to appear and that would not have required a delay of the trial. The timing of C's failure to appear is significant in this case. The state learned at 8:15 a.m. that C had failed to appear as directed in the subpoena, and Jones knocked on C's door at roughly the same time. Although another hour passed before the state attempted to persuade the court that C was "unavailable" and five more hours passed before the case moved to the point of jury selection, there is no evidence that the state pursued—or considered pursuing—other measures in that time to produce C as a witness at trial. Instead, the state insisted in the trial court that "[t]here

were simply no other efforts the State could have made." But
the record shows otherwise. Specifically, testimony from the
state's witnesses makes clear that they had a phone number
for C through which they had contacted C on multiple occa-
sions pretrial and that Jones was aware that C had a pro-
bation officer whom Jones had considered to be a potential
resource for locating C pretrial. The state, however, offered
no evidence that it had attempted, or was willing to attempt,
any of those measures *after* it learned that its pretrial efforts
had been insufficient to bring C to trial.[18]

    a.   Attempting to call C after she failed to appear

    In arguments to the trial court, defendant primar-
ily highlighted the lack of certainty regarding the reason for
C's absence from court. Defendant emphasized that C had
assured the victim's advocate that she would attend trial
if needed, that there had been no "affirmative statements
made by [C] stating she will not show up, that she will not
testify, that she will not cooperate," and that the subpoena
may have created confusion about the courtroom in which C
was to appear. That uncertainty could have been addressed
by attempting to call C on the phone to see if there was an
innocent explanation for her absence. But, despite defen-
dant's arguments, the state offered no evidence that it
attempted to contact C by phone after she failed to appear
and no evidence or explanation to support a conclusion that
calling C would have been futile, too time consuming, or
otherwise not a reasonably available means of producing
her as a witness.

    The dissent would excuse that gap in proof because
defendant has never expressly proposed that the state
should have called C on the morning of trial. 369 Or at 27-28

---

[18] The state also failed to respond when the trial court raised the possibility
that the state could "send an officer out and see if they can round [C] up and
bring her in and we can start this trial at 1:30." Although defendant objected to
a delay of the trial, the course of proceedings shows that any measures that the
state could have attempted during the morning pretrial hearing would not have
delayed the trial. In another case, it might be significant that the state failed to
take advantage of the time needed to resolve pretrial issues to attempt additional
measures for producing the witness. But it appears that both the parties and the
trial court assumed that "send[ing] an officer out" would have delayed the start
of trial. We need not decide whether that measure was also reasonably available,
and we decline to do so in this case.

(Balmer, J., dissenting).[19] But, as we have explained above, the state's obligation to prove that a witness is constitutionally "unavailable" is not limited to exhausting reasonably available measures that the defendant asks it to exhaust. That does not mean that the state must address measures to which it is only possible to point "[w]ith the benefit of years of hindsight." *See* 369 Or at 29 (Balmer, J., dissenting). At a minimum, however, the state must make some showing as to measures that are specifically identified during the course of the hearing—either a showing that it has exhausted those measures or a basis on which to conclude that the measures are not reasonably available for producing the witness. Given the testimony of the state's own witnesses, the state cannot claim that it was unaware that a phone call to C was seemingly a reasonably available means of producing C as a witness. And given defendant's emphasis on the possibly innocent explanation for C's absence, the state did not need to be reminded that its pretrial measures failed to address that uncertainty. Under the circumstances, the state's failure to either call C on the morning of trial or to explain why doing so would have been unreasonable was a failure of proof that C was "'truly unavailable to testify at [a] trial.'" *Harris*, 362 Or at 62 (quoting *Herrera*, 286 Or at 355).[20]

### b. Attempting to contact C through her probation officer

To the extent that the state viewed C's absence from court as a willful disregard of the subpoena, the record identifies at least one additional measure for persuading C to appear that the state failed to exhaust. In argument,

---

[19] According to the dissent, defendant's "whole argument before the trial court regarding C's unavailability on the morning of trial was about efforts that the state had or had not made *before* the day of trial" 369 Or at 27 (Balmer, J., dissenting) (emphasis in original). We agree that defendant never expressly proposed that the state could have called C on the morning of trial. However, given defendant's extensive emphasis on uncertainty as to the reason for C's absence, we disagree that defendant's arguments in the trial court could have been understood as faulting only the state's proof with respect to *pretrial* efforts.

[20] The dissent observes that "nothing in the record indicates that [the state] did not" call C on the morning of trial or consider and reject that measure. 369 Or at 29 (Balmer, J., dissenting). The observation is factually accurate but irrelevant under a standard that places the burden on the state to show that it exhausted the reasonably available measures for producing the witness.

defendant highlighted Jones's testimony that she was aware of C's probation officer and considered the probation officer a possible source of assistance when Jones needed to serve the subpoena on C. Yet the state offered neither evidence that it had attempted to contact the probation officer on the morning of trial nor explanation for why it had failed to do so.[21] On appeal, the state argues that C's probation officer would have had nothing to add to "the chorus of state actors" trying to persuade C to come to court. But the argument focuses on the wrong question. As explained above, the standard for proving that a witness is constitutionally "unavailable" asks more than whether additional measures are *likely* to produce the witness for trial; it asks whether the measure is "reasonably available" for producing the witness. *See Harris*, 362 Or at 67. Although evidence that C's probation officer had nothing to add to "the chorus of state actors" trying to persuade C to come to court might have supported a determination that contacting the probation officer would have been "futile," the state offered no evidence of the sort. On the contrary, the only evidence that the state offered regarding the probation officer was Jones's testimony that she had considered the probation officer to be a potential resource when attempting to locate C to serve her with the subpoena. Moreover, even on appeal, the state does not offer a reason to question the statutory authority on which defendant relies to argue that C's probation officers may have had greater influence over C than the others in the "chorus of state actors." *See* ORS 137.540(1)(h) (requiring that probationers allow the probation officer to visit their home or work); ORS 137.540 (1)(m) (requiring that probationers "[r]eport as required and abide by the direction" of the probation officer). We agree with defendant that the state's failure to present evidence

---

[21] There is no dispute that defendant specifically argued that the state should have made additional attempts to use the probation officer as a means of producing C as a witness, but the dissent again faults defendant for failing to expressly propose that the state pursue that measure *on the morning of trial.* 369 Or at 27-28 (Balmer, J., dissenting). As quoted above, however, defendant's arguments in the trial court appear to have faulted the state's failure to reach out to the probation officer both before trial and "instead of" going to C's house on the morning of trial. 369 Or at 7 n 6. In any event, as explained with respect to the measure of a phone call to C, the state's obligation to prove that C was constitutionally "unavailable" was not limited to addressing the reasonably available measures that defendant expressly proposed. 369 Or at 21.

regarding contact with the probation officer represents a gap in the state's showing that it "exhausted all reasonably available means of producing the witness." *See Harris*, 362 Or at 66.[22]

### III.   CONCLUSION

Under the circumstances of this case, we conclude that the state failed to demonstrate that it had exhausted reasonably available measures for producing C as a witness. Instead, as defendant pointed out, the state showed only that C had not appeared as directed by the subpoena and that she had not been at her house at 8:20 a.m. when Jones knocked on the door. Although that evidence may support the court's factual inference that C was deliberately absent from the courtroom, the standard for "unavailability" that we have articulated is not a factual question. As we have emphasized repeatedly, a defendant's constitutional right to confront witnesses requires that, "[b]efore the state can rely on prior out-of-court statements, it must demonstrate why the use of such evidence is 'genuinely necessary'" and that the state does so by "show[ing] that it is unable to produce a witness after exhausting reasonable means of doing so." *Id.* at 57, 62 (quoting *Herrera*, 286 Or at 355). Here, the state made no showing that it had attempted to call C or contact her through her probation officer on the morning of trial and no showing that either measure would have been futile or otherwise not a reasonably available measure for producing C as a witness. Given defendant's arguments and the testimony of the state's own witnesses that they were aware of those measures, we cannot conclude that the state met its burden to demonstrate that its reliance on C's hearsay statements was "'genuinely necessary.'" *See id.* at 62 (quoting *Herrera*, 286 Or at 355).

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

---

[22] We do not intend to suggest that probation officers must, or routinely do, interfere when a probationer is reluctant to testify as a witness. The relevance of defendant's argument about the probation officer is that he raised that method of producing C as a witness, and the state, which bore the burden to show that it had exhausted all reasonably available means for producing C as a witness, offered neither evidence nor explanation for its failure to contact C's probation officer.

**BALMER, J.,** dissenting.

Four years ago, in *State v. Harris*, 362 Or 55, 404 P3d 926 (2017), we held that a defendant who had objected to a continuance to allow the state to take additional steps on the day of trial to secure the attendance of a witness could not later argue that that witness was not unavailable. Here, when C, a key witness, failed to appear for trial despite having been subpoenaed, the trial court suggested a brief delay to "send an officer out and see if they can round her up and bring her in." Defendant, however, rejected any delay, saying, "this is the date and time for trial." The facts are not materially different from those in *Harris*, and yet the majority now holds that, although defendant objected to the continuance suggested by the trial court, he nevertheless may argue that the witness was not unavailable. The majority goes on to conclude that the witness was not unavailable and that the hearsay testimony was improperly admitted.

The majority reaches those conclusions by an unusual route. Defendant's argument in this court is straightforward and best summed up by a quotation from his brief:

> "In this case, the state left two 'reasonably available means' for producing C untried: (1) it did not enlist the aid of C's probation officer to encourage C's attendance, and (2) it took no steps to compel C's compliance with her subpoena. Given the fact that C displayed a clear reluctance to cooperate with the prosecution, the state should have attempted the first method prior to the morning of trial. Once C actually failed to appear, the state should have sought a continuance so that it could pursue the statutory method of compelling C's appearance—that is, a remedial-contempt proceeding."

The majority's ruling for defendant is not based on either of those arguments. It does not address whether the state's failure to contact C's probation officer "prior to the morning of trial" was deficient, bypassing the relevant issue argued at the trial court: whether the state made sufficient efforts to bring the witness to court in the days and weeks before trial. The majority also does not address defendant's second argument: that "the state should have sought a continuance" to initiate remedial contempt proceedings against C.

The majority instead focuses on the short time period between the state's last effort to contact the witness by going to her home at 8:20 a.m. on the day of trial and about an hour later when the trial court began hearing pretrial motions. The majority's examination of what it now says the state should have done differently during that brief time period five years ago fails to appreciate the real-time, in-court circumstances in which the trial judge, prosecution and defense lawyers, and parties and potential witnesses were operating, as well as the arguments that defendant did and did not make at that time. The majority essentially sidesteps the considered ruling by the experienced trial court judge, which was based on the arguments the parties made and the testimony of three witnesses about the state's efforts to keep in contact with and convince C to appear at trial. In doing so, the majority reaches the wrong result. I respectfully dissent.

The legal issue is whether the state should have been permitted to introduce reliable hearsay evidence at trial because a witness, C, with firsthand knowledge of the crime—she was the victim of defendant's domestic violence assault—was unavailable.[1] As in *Harris*, the state in this case took steps before trial to ensure that C would be present to testify, including subpoenaing her and contacting her multiple times, but C failed to appear on the day of trial. And here, as in *Harris*, there is no dispute that there were at least some additional measures that the state possibly could have taken, both before trial and on the day of trial, to attempt to secure the attendance of C. In *Harris*, when the witness there failed to appear on the day of trial, the defendant "objected to a continuance that would have enabled the state to pursue other means of securing its witness." 362 Or at 57. Accordingly, we held that "[the] defendant cannot be heard now to complain that the state did not exhaust those measures." *Id*. We affirmed the defendant's conviction on that basis.

---

[1] Here, the person who would report C's statements was walking her dog near C's house when she heard C calling for help, saw C naked and bleeding, and heard other statements from C about defendant's assault. The trial court ruled that C was "unavailable" and that C's statements, as reported by the witness, were admissible under the "excited utterance" exception to the hearsay rule, OEC 803(2).

Here, as noted above, defendant argues that C was not truly "unavailable" because "[t]he state should have sought a continuance to initiate remedial contempt proceedings" against C. The state responds that, as in *Harris*, it was defendant who objected to a continuance and, therefore, that defendant's argument is foreclosed by that decision. The majority, however, declines to resolve that dispute here or decide the case on that basis, and we see no reason to discuss that issue further.

Defendant's other argument before this court, as quoted above, is that the state should have contacted and enlisted the help of C's probation officer *before* trial. But that argument finds little traction in this case. If the state had had difficulty contacting C or could not find her to serve her with a subpoena, it might have made sense to turn to her probation officer for assistance. But that is not what happened here. Before trial, employees of the district attorney's office had spoken to C by phone on multiple occasions, and she had been successfully served with a subpoena. In that context, C's probation officer would have had little to add. Defendant argues that the probation officer could have emphasized to C that she was required to comply with the subpoena, but the subpoena itself conveyed that much—by law, a subpoena must state that, "in the name of the State of Oregon," the witness is "hereby commanded to appear" before the trial court "as a witness *** in a criminal action." ORS 136.575(2). Understandably, then, as with defendant's argument regarding the continuance, the majority does not rule for defendant on that basis either. Instead, it rules for defendant on other grounds.

I agree with substantial parts of the majority opinion. As we held in *Harris*, and as the majority affirms, the state must "exhaust reasonably available measures for producing the witness," 362 Or at 67, but it is not required to take all possible steps to ensure that a witness appears at trial, *see id.* ("[W]e reiterate that the rule is one of reasonableness under the circumstances of the individual case."). I also agree with the majority's rejection of any suggestion in the Court of Appeals' opinion of a categorical rule that a trial court may consider only the state's *pretrial* efforts to secure the witness. *See* 369 Or at 15. Such a categorical

approach would be inconsistent with the more general rule stated in *Harris* that the state must exhaust reasonable efforts to secure the attendance of the witness, but that it need not engage in efforts that are likely to be futile.

And the majority appears to recognize that neither of defendant's arguments in this court offers a basis for reversal, since it does not take the more straightforward path of ruling for defendant on one of the two grounds that was briefed by the parties. Rather, the majority departs from defendant's arguments and instead faults the state for failing to take steps that it might have taken between 8:15 a.m. on the day of trial, when C was scheduled to appear (but did not), and the hearing an hour later, when the state asked the court to consider C unavailable. By doing so, the majority avoids addressing the state's persistent efforts *before* trial. And the majority's approach allows it to simply dismiss defendant's objection to the continuance, because that objection did not come until *after* the time when the majority now says the state should have undertaken additional efforts to secure C's attendance. 369 Or at 14-15, 15 n 14).

The majority concludes that the state failed to meet its burden because, between 8:20 a.m. (when a representative of the district attorney visited C's house) and the time of the pretrial hearing, the state did not attempt to call C or attempt to contact her through her probation officer. Contradicting the explicit and implicit findings of the trial court, the majority holds that the state "failed to demonstrate that it had exhausted reasonably available measures for producing C as a witness." 369 Or at 23.

I disagree with the majority's approach for several reasons. First, the majority rewrites what the parties argued and what happened in the trial court. The whole argument before the trial court regarding C's unavailability on the morning of trial was about efforts that the state had or had not made *before* the day of trial. Defendant's contention was that *those* efforts, or lack thereof, were insufficient, not that the state should have taken additional steps on the morning of trial. At the OEC 104 hearing, defendant never even suggested either of the two grounds on which the majority now rests its decision: that the state, on the day of trial, should

have called C on her phone or tried again to reach C's probation officer.[2]

The majority appears to have based this new focus on what happened *after* C failed to appear at trial, but *before* the court's suggestion about a continuance an hour later, drawing on comments made during the *state's* oral argument in this court about what efforts the state is required to make on the day of trial if a witness fails to appear. The state agreed that its obligation to bring its witnesses in person to trial did not cease at the time set for trial. It accepted the general proposition that, if prosecutors knew where the absent witness was at the time of trial—the example discussed was that the state knew the witness was at a coffee shop across the street from the courthouse—the state could not establish unavailability simply by pointing to its pretrial efforts to secure the attendance of the witness. No one disputes that proposition. The state did not concede, however, that it had failed to make reasonable efforts on the day of trial in this case, and it correctly pointed out that "the question of doing more [on the day of trial] never came up" and was "never even raised" by defendant. For that reason, "the state had no opportunity or any impetus to say anything about whether they had to do more" on the day of trial. And, of course, before the trial court, the state did make clear that, during the very time period that the majority now asserts is critical, Jones, a representative of the district attorney's office, had personally gone to C's house in an effort to locate her and bring her to court.

If defendant or the court had raised any issue about the insufficiency of the state's effort during that time period, it is apparent that the state could and would have responded to those assertions. *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008) ("Preservation *** ensures fairness to an opposing party, by permitting the opposing party to respond to a contention and by otherwise not taking the opposing party by surprise."). As to the majority's apparent factual

---

[2] Indeed, defendant's only argument at trial about what the state did or did not do on the day of trial was to criticize the state for sending a representative to her house at 8:20 a.m. during a time when she should have been on her way to court or already there. Defendant argued instead that, before the day of trial, the state "could have reached out to her PO more regularly."

finding that attempting to contact C's probation officer on the morning of trial was a reasonable way of producing C as a witness, the state presumably would have pointed out that it had made previous, unsuccessful efforts to contact the probation officer, as well as other potential problems with using a probation officer. Similarly, although, as the majority points out, the state did not put on evidence that state representatives tried to call C on her phone after she failed to appear at 8:15 a.m., nothing in the record indicates that they did not. In fact, given that Jones had gone to C's house in search of her on the morning of trial, it is possible that she called C as well or that Jones had determined that C, as an obviously reluctant witness, would find it harder to avoid someone knocking on her door than an incoming phone call.

But, of course, the record is silent on whether the state tried to call C or contact her probation officer between 8:20 a.m. and the hearing on the morning of trial or, if they did not do so, the reasons why. That is because neither defendant, the prosecutor, nor the trial court would have had any idea that this court, five years later, would hold that the state was required to put on evidence of what its representatives had done in the hour immediately following the witness's failure to appear in order to meet its burden of demonstrating the witness's unavailability. The issue simply was not discussed.

In my view, the trial court was in a better position than this court to assess whether, given all the circumstances, the state met its burden of showing that it took all reasonable steps to secure the attendance of C, both before and on the day of trial. There is no hint in this record that the state failed to make good faith efforts to secure C's attendance or was engaged in a charade and actually wanted C's statements introduced through the hearsay testimony of another witness. With the benefit of years of hindsight, it is possible to point to additional steps that the state could have taken. That will almost always be the case. Having heard the testimony of three witnesses who had tried to ensure that C would appear at trial, up to and including the day of trial, the trial judge concluded that C "did not want to be contacted by them anymore." The judge stated:

"She did not want to participate in this process and was not cooperative. Although she may not have stated expressly that she was not coming to trial, the logical conclusion from that and from her failure to return phone calls, failure to respond to inquiries and failure to respond when the State sent someone to her door this morning, is—the only logical inference from that is that she is not cooperating and refusing to come to testify at trial."

The trial court concluded, based on explicit and implicit factual findings which are supported by the record, that the state had made all reasonable efforts to bring C to court before and on the day of trial, that they had been unsuccessful, and that C therefore was unavailable. I see no error in the trial court's statements or conclusions, based on the case as presented to that court by the parties.

I respectfully dissent.

Nelson and Garrett, JJ., join in this dissenting opinion.